**FILE COPY**

1 | LERACH COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
2 | SHAWN A. WILLIAMS (213113)
   | 100 Pine Street, Suite 2600
3 | San Francisco, CA 94111
   | Telephone: 415/288-4545
4 | 415/288-4534 (fax)
   | swilliams@lerachlaw.com
5 |   – and –
   | DARREN J. ROBBINS (168593)
6 | TRAVIS E. DOWNS III (148274)
   | 655 West Broadway, Suite 1900
7 | San Diego, CA 92101
   | Telephone: 619/231-1058
8 | 619/231-7423 (fax)
   | darrenr@lerachlaw.com
9 | travisd@lerachlaw.com

10 | Attorneys for Plaintiff
    | [Additional counsel appear on signature page.]

**ORIGINAL
FILED**

AUG 2 1 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**E-filing**

*RS*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| ARLEE C. GOWEN, Derivatively on Behalf of JUNIPER NETWORKS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> SCOTT G. KRIENS, STRATTON D. SCLAVOS, WILLIAM R. STENSRUD, ROBERT M. CALDERONI, KENNETH A. GOLDMAN, WILLIAM R. HEARST III, KENNETH LEVY, FRANK J. MARSHALL, VINOD KHOSLA, ROBERT R.B. DYKES, PRADEEP SINDHU, JAMES A. DOLCE, JR., MARCEL L. GANI, ASHOK KRISHNAMURTHI, LLOYD CARNEY and PETER L. WEXLER, <br><br> Defendants, <br><br> – and – <br><br> JUNIPER NETWORKS, INC., a Delaware corporation, <br><br> Nominal Defendants. | No. **C 07 4298** <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, CONSTRUCTIVE FRAUD, CORPORATE WASTE, UNJUST ENRICHMENT, GROSS MISMANAGEMENT, ACTION FOR ACCOUNTING AND VIOLATION OF CALIFORNIA CORPORATIONS CODE <br><br><br><br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

## NATURE OF THE ACTION

1.    This is a shareholders derivative action on behalf of nominal defendant Juniper Networks, Inc. ("Juniper" or the "Company") against its entire Board of Directors and certain current and former top officers and directors (collectively, "defendants") for violations of federal and state law, including breaches of fiduciary duty, abuse of control, corporate waste, unjust enrichment, and gross mismanagement arising out of a scheme and wrongful course of conduct whereby defendants backdated stock option grants to themselves and other top Juniper executives, including the Company's Chairman and Chief Executive Officer ("CEO"), Scott Kriens ("Kriens"), and Vice-Chairman Pradeep Sindhu ("Sindhu"). Each of the defendants also participated in the concealment of the backdating option scheme detailed herein, and/or refused to take advantage of the Company's legal rights to require these insiders to disgorge the illicitly obtained incentive compensation and proceeds diverted to them since at least 1999, when Juniper completed its Initial Public Offering ("IPO").

2.    In breach of their fiduciary duties owed to Juniper and in violation of the securities laws, ever since the Company went public, defendants knowingly and deliberately engaged in a continuous scheme to grant undisclosed, in-the-money stock options to Juniper executives by backdating stock option grants to coincide with historically low closing prices for the Company's stock and to falsify Juniper's financial statements for 1999-2005 and proxy statements for 2000-2006. As Juniper recently acknowledged, instead of granting options at market value on the date of grant, the Company failed in many cases to comply with the terms of its stock option plans. *See* 2006 Form 10-K at ¶32 ("There were numerous instances in which grant dates were chosen with the benefit of hindsight as to the price of our stock, so as to give favorable exercise prices."). As a result of this subterfuge, the Company has restated its financial statements to a nearly $900 million charge for compensation expenses relating to past stock option grants. Moreover, the Company has admitted that a total of 110.5 million or 76% of the 146 million shares of common stock granted were incorrectly dated.

3.    By engaging in this scheme, defendants were able to conceal that Juniper was not recording material compensation expenses and was materially understating the Company's net

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  income and earnings per share and/or materially overstating its net losses and losses per share.

2  Defendants collectively realized over $717.2 million in illicit compensation through the exercise of

3  illegally backdated options grants and subsequent sale of Juniper stock. By contrast, Juniper has

4  suffered, and will continue to suffer, significant financial and non-monetary damages and injuries.

5.

### INTRODUCTION

6      4.     On March 18, 2006, an article appeared in *The Wall Street Journal* entitled "The

7  Perfect Payday – Some CEOs reap millions by landing stock options when they are most valuable;

8  Luck – or something else?" *The Wall Street Journal*'s analysis focused on financial filings from

9  several companies and was an extension of recent academic articles which suggested that

10  "backdating [stock options] was widespread, particularly from the start of the tech-stock boom in the

11  1990s through the Sarbanes-Oxley corporate reform act of 2002." While Juniper was not directly

12  implicated in the option-timing scandal at that point, that was soon to change.

13      5.     Suspicion that Juniper had issued manipulated stock options first arose on May 18,

14  2006, when *The Wall Street Journal* published an article entitled "Criminal Probe of UnitedHealth's

15  Options Begins." This article describes a study described a study conducted by the Center for

16  Financial Research and Analysis ("CFRA") that examined the stock option grants in 100 companies

17  that issued a high proportion of stock option grants relative to their executive compensation. The

18  study identified 17 companies that were at risk for manipulating the timing of their option grants

19  between 1997 and 2002. The CFRA found that several of the options issued at Juniper were at high

20  risk of being backdated.

21      6. .    Following this disclosure, the situation at Juniper began to unravel. First, on May 22,

22  2006, the Company announced that it had received a request for information from the United States

23  Attorney for the Eastern District of New York regarding its stock option grants. Then, on May 24,

24  2006, the Company's counsel received a letter from the United States Securities and Exchange

25  Commission ("SEC") indicating that the SEC was conducting an inquiry regarding Juniper's stock

26  option granting practices.

27      7.     On July 19, 2006, the Company was forced to admit that its stock options had been

28  manipulated. In a press release, Juniper stated that "the actual measurement dates for financial

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 accounting purposes of certain stock option grants issued in the past differ from the recorded grant

2 dates of such awards."

3    8.    Just as shareholders were digesting this admission, on August 10, 2006, Juniper

4 announced that it would restate its "historical financial statements to record additional non-cash

5 charges for stock-based compensation expense related to past option grants." Moreover, the

6 Company repudiated its previously-filed financial statements, disclosing that "the financial

7 statements and all earnings press releases and similar communications issued by the Company

8 relating to periods beginning on or after January 1, 2003 should therefore not be relied upon."

9    9.    On December 20, 2006, Juniper announced the final results of its internal stock option

10 investigation. In addition to confirming "that there were numerous instances in which grant dates

11 were chosen with the benefit of hindsight as to the price of the Company's stock, so as to give

12 favorable prices," the Company confirmed that its "CEO, Scott Kriens, received two stock option

13 awards with measurement date issues." The Company further stated that it "currently anticipates

14 that it will record additional non-cash charges for stock-based compensation expense of

15 approximately $900 million."

16    10.    Finally, on March 9, 2007, Juniper issued its restated financial results. In its 2006

17 Form 10-K filing with the SEC, Juniper once again repudiated its prior financial statements, stating

18 that "[f]inancial information included in the reports on Form 10-K, Form 10-Q and Form 8-K filed

19 by Juniper Networks prior to August 10, 2006, and the related opinions of its independent registered

20 public accounting firm, and all earnings press releases and similar communications issued by the

21 Company prior to August 10, 2006 should not be relied upon." With respect to the backdating of

22 stock option grants, the Company further stated:

23    •    ***There were numerous instances in which grant dates were chosen with the
        benefit of hindsight as to the price of our stock, so as to give favorable
24        exercise prices***. In this regard, the Audit Committee identified serious
        concerns regarding the actions of certain former management in connection
25        with the stock option granting process

26

27        *    *    *

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Our CEO, Scott Kriens, received two stock option awards whose measurement dates for financial accounting purposes differ from the recorded grant dates for such awards.

11.    Defendants' misconduct is egregious. Backdating at Juniper has unjustly enriched the Company's top executives, including its Chairman, Kriens, and Vice Chairman, Sindhu, to the detriment of Juniper. A key purpose of granting stock options is to give recipients an incentive to improve their employer's performance, including its stock price. Backdating options such that they carry a lower price runs counter to this goal, as it immediately confers upon the recipient a "paper profit" right from the start. For example, if a company grants options on May 20, when its stock price is $20, but records the date of issue as April 22, when the stock price was only $15, it would be giving those who were granted options a riskless, immediate $5 profit.

12.    Due to defendants' conduct, Juniper has been forced to undertake costly internal investigations. Such expenditures are but a subset of the problems caused by defendants' options malfeasance. For example, as alleged herein, Juniper's annual reports and proxy materials filed with the SEC are false and misleading; the Company reported financial results which violated Generally Accepted Accounting Principles ("GAAP") and will require formal restatement; and Juniper may be in violation of certain provisions of the Internal Revenue Code. All of this, of course, may lead to millions of dollars of liability to the SEC, Internal Revenue Service ("IRS") and private civil litigants.

13.    By this action, plaintiff seeks to recover defendants' ill-gotten profits and to institute corporate governance reforms to ensure the compliance of Juniper's directors and officers with the high fiduciary standards expected of corporate fiduciaries.

## INTRADISTRICT ASSIGNMENT

14.    Assignment in the San Jose Division is appropriate pursuant to Civil L.R. 3-2(e) because a substantial part of the events giving rise to the plaintiff's claims occurred in the County of Santa Clara.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over this action pursuant to §§10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b), 78n(a) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder. Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the acts, transactions, practices and course of business alleged herein. This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs. This Court also has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. §1367. This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

16.    Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Juniper is located in and conducts its business in this District. Further, defendants conduct business in this District, and certain of the defendants are citizens of California and reside in this District.

## PARTIES

17.    Plaintiff Arlee C. Gowen is a shareholder of Juniper. Plaintiff holds and held Juniper stock at times relevant hereto. Plaintiff is a citizen of Texas.

18.    Nominal defendant Juniper Networks, Inc. ("Juniper" or the "Company") is a Delaware corporation with its executive offices and principal place of business located at 1194 North Mathilda Avenue, Sunnyvale, California 94089. Juniper develops purpose-built, high performance IP platforms that enable customers to support a wide variety of services and applications at scale. Although incorporated in Delaware, Juniper has few, if any, major assets, employees or operations located there. By contrast, Juniper owns millions of dollars of property located in California, and its executive offices have always been in California. Juniper generated more revenue and income from its operations in California than in Delaware during the relevant period. The Company's shareholder

1  reports emanated from California.  Juniper conducted few, if any, Board of Directors meetings in

2  Delaware, whereas the majority of the Company's Board and senior management meetings occurred

3  in or, if telephonic, originated from California.

4     19.  Defendant Scott G. Kriens ("Kriens") has been Chairman of the Board and CEO of

5  the Company since October 1996.  Kriens participated in the issuance of and signed Juniper's false

6  and misleading shareholder reports, including Juniper's proxy statements for 2000-2006 and annual

7  reports on Form 10-K for 1999-2005, as well as Juniper's Registration Statement for its IPO.

8  Defendant Kriens received personal financial benefits in the form of at least 3.5 million backdated

9  options. He also sold 7.7 million shares of Juniper stock, for unlawful insider trading proceeds of at

10  least $272.9 million, in violation of California Corporations Code §§25402 and 24502.5 and the

11  federal securities laws.  Kriens is a citizen of the State of California.

12     20.  Defendant Stratton D. Sclavos ("Sclavos") has been a Director of the Company since

13  2000 and a member of the Audit Committee for the years 2000-2002.  As a member of the Audit

14  Committee, Sclavos reviewed Juniper's audited financial statements, including the sections dealing

15  with the accounting for employee stock-based compensation, and with management "recommended

16  to the Board" that the "audited financial statements be included in Juniper's Annual Reports."

17  Sclavos participated in the issuance of and signed Juniper's false and misleading shareholder reports,

18  including Juniper's proxy statements for 2003-2006 and annual reports on Form 10-K for 2001-

19  2005.  Defendant Sclavos received personal financial benefits in the form of at least 40,000

20  backdated options.  Sclavos is a citizen of the State of California.

21     21.  Defendant William R. Stensrud ("Stensrud") has been a Director of the Company

22  since 1996 and a member of the Compensation Committee for the years 2002-2006.  As a member of

23  the Compensation Committee, Stensrud authorized and approved stock option grants to defendants

24  with exercise prices at less than fair market value on the date of grant in violation of Juniper's stock

25  option plans and public disclosures.  Stensrud participated in the issuance of and signed Juniper's

26  false and misleading shareholder reports, including Juniper's proxy statements for 2000-2006 and

27  annual reports on Form 10-K for 1999-2005. Defendant Stensrud sold 582,600 shares of Juniper

28  stock, for unlawful insider trading proceeds of at least $39.5 million, in violation of California

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  Corporations Code §§25402 and 24502.5 and the federal securities laws. Stensrud is a citizen of the

2  State of California.

3      22.    Defendant Robert M. Calderoni ("Calderoni") has been a Director of the Company

4  since October 2003 and a member of the Audit Committee for the years 2003-2006. As a member of

5  the Audit Committee, Calderoni reviewed Juniper's audited financial statements, including the

6  sections dealing with the accounting for employee stock-based compensation, and with management

7  "recommended to the Board" that the "audited financial statements be included in Juniper's Annual

8  Reports." Calderoni participated in the issuance of and signed Juniper's false and misleading

9  shareholder reports, including Juniper's proxy statements for 2003-2006 and annual reports on Form

10  10-K for 2003-2005. Defendant Calderoni sold 39,700 shares of Juniper stock, for unlawful insider

11  trading proceeds of at least $1,016,549, in violation of California Corporations Code §§25402 and

12  24502.5 and the federal securities laws. Calderoni is a citizen of the State of Connecticut.

13      23.    Defendant Kenneth A. Goldman ("Goldman") has been a Director of the Company

14  since October 2003 and a member of the Audit Committee for the years 2003-2006. As a member of

15  the Audit Committee, Goldman reviewed Juniper's audited financial statements, including the

16  sections dealing with the accounting for employee stock-based compensation, and with management

17  "recommended to the Board" that the "audited financial statements be included in Juniper's Annual

18  Reports." Goldman participated in the issuance of and signed Juniper's false and misleading

19  shareholder reports, including Juniper's proxy statements for 2003-2006 and annual reports on Form

20  10-K for 2003-2005. Defendant Goldman sold 14,000 shares of Juniper stock, for unlawful insider

21  trading proceeds of at least $360,230, in violation of California Corporations Code §§25402 and

22  24502.5 and the federal securities laws. Goldman is a citizen of the State of California.

23      24.    Defendant William R. Hearst III ("Hearst") has been a Director of the Company since

24  1996 and a member of the Audit Committee for the years 1999-2006. As a member of the Audit

25  Committee, Hearst reviewed Juniper's audited financial statements, including the sections dealing

26  with the accounting for employee stock-based compensation, and with management "recommended

27  to the Board" that the "audited financial statements be included in Juniper's Annual Reports."

28  Hearst participated in the issuance of and signed Juniper's false and misleading shareholder reports,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  including Juniper's proxy statements for 2000-2006 and annual reports on Form 10-K for 1999-

2  2005. Defendant Hearst sold 912,585 shares of Juniper stock, for unlawful insider trading proceeds

3  of at least $48.2 million, in violation of California Corporations Code §§25402 and 24502.5 and the

4  federal securities laws.  Hearst is a citizen of the State of California.

5          25.     Defendant Kenneth Levy ("Levy") has been a Director of the Company since 2003

6  and a member of the Compensation Committee for the years 2003-2006.  As a member of the

7  Compensation Committee, Levy authorized and approved stock option grants to defendants with

8  exercise prices at less than fair market value on the date of grant in violation of Juniper's stock

9  option plans and public disclosures. Levy participated in the issuance of and signed Juniper's false

10  and misleading shareholder reports, including Juniper's proxy statements for 2003-2006 and annual

11  reports on Form 10-K for 2003-2005.  Levy is a citizen of the State of California.

12          26.     Defendant Frank J. Marshall ("Marshall") has been a Director of the Company since

13  2004 and a member of the Compensation Committee for the years 2005-2006.  As a member of the

14  Compensation Committee, Marshall authorized and approved stock option grants to defendants with

15  exercise prices at less than fair market value on the date of grant in violation of Juniper's stock

16  option plans and public disclosures.  Marshall participated in the issuance of and signed Juniper's

17  false and misleading shareholder reports, including Juniper's proxy statements for 2004-2006 and

18  annual reports on Form 10-K for 2004-2005.  Defendant Marshall sold 208,080 shares of Juniper

19  stock, for unlawful insider trading proceeds of at least $4.5 million, in violation of California

20  Corporations Code §§25402 and 24502.5 and the federal securities laws.  Marshall is a citizen of the

21  State of California.

22          27.     Defendant Vinod Khosla ("Khosla") was a Director from February 1996-April 15,

23  2004 and a member of the Compensation Committee for the years 1999-2003.  As a member of the

24  Compensation Committee, Khosla authorized and approved stock option grants to defendants with

25  exercise prices at less than fair market value on the date of grant in violation of Juniper's stock

26  option plans and public disclosures. Khosla participated in the issuance of and signed Juniper's false

27  and misleading shareholder reports, including Juniper's proxy statements for 2000-2003 and annual

28  reports on Form 10-K for 1999-2003.  Khosla is a citizen of the State of California.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

28.    Defendant Pradeep Sindhu ("Sindhu") has been Vice-Chairman, Director and Chief Technical Officer of the Company since September 1996. Sindhu participated in the issuance of and signed Juniper's false and misleading shareholder reports, including Juniper's proxy statements for 2000-2006 and annual reports on Form 10-K for 1999-2005. Defendant Sindhu received personal financial benefits in the form of at least 1.7 million backdated options. He also sold 4.9 million shares of Juniper stock, for unlawful insider trading proceeds of at least $188.5 million, in violation of California Corporations Code §§25402 and 24502.5 and the federal securities laws. Sindhu is a citizen of the State of California.

29.    Defendant Robert R.B. Dykes ("Dykes") has been Chief Financial Officer ("CFO") of the Company since January 1, 2005. Dykes participated in the issuance of and signed Juniper's false and misleading shareholder reports, including Juniper's proxy statements for 2005-2006 and annual reports on Form 10-K for 2004-2005. Dykes is a citizen of the State of California.

30.    Defendant Marcel L. Gani ("Gani") was CFO of the Company from July 2002-December 2004. Gani participated in the issuance of and signed Juniper's false and misleading shareholder reports, including Juniper's proxy statements for 2000-2003 and annual reports on Form 10-K for 1999-2003. Defendant Gani received personal financial benefits in the form of at least 1.5 million backdated options. He also sold 1,155,000 shares of Juniper stock, for unlawful insider trading proceeds of at least $71,347,000 in violation of California Corporations Code §§25402 and 24502.5 and the federal securities laws. Gani is a citizen of the State of California.

31.    Defendant Peter L. Wexler ("Wexler") was Vice President of Engineering for the Company from 1997-2003. Wexler participated in the issuance of Juniper's false and misleading shareholder reports, including Juniper's proxy statements for 2000-2003 and annual reports on Form 10-K for 1999-2003. Defendant Wexler received personal financial benefits in the form of at least 580,000 backdated options. He also sold 754,944 shares of Juniper stock, for unlawful insider trading proceeds of at least $86.9 million, in violation of California Corporations Code §§25402 and 24502.5 and the federal securities laws. Wexler is a citizen of the State of California.

32.    Defendant Ashok Krishnamurthi ("Krishnamurthi") was Vice President of the Company from 1996-June 2004. Krishnamurthi participated in the issuance of Juniper's false and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  misleading shareholder reports, including Juniper's proxy statements for 2000-2004 and annual
2  reports on Form 10-K for 1999-2004. Defendant Krishnamurthi received personal financial benefits
3  in the form of at least 367,500 backdated options. He also sold 160,000 shares of Juniper stock, for
4  unlawful insider trading proceeds of at least $3.7 million, in violation of California Corporations
5  Code §§25402 and 24502.5 and the federal securities laws. Krishnamurthi is a citizen of the State of
6  California.

7      33.    Defendant Lloyd Carney ("Carney") was Chief Operating Officer of the Company
8  from January 2002-July 2003. Carney participated in the issuance of Juniper's false and misleading
9  shareholder reports, including Juniper's proxy statements for 2002-2003 and annual reports on Form
10  10-K for 2002-2003. Defendant Carney received personal financial benefits in the form of at least
11  1,500,000 backdated options. Carney is a citizen of the State of California.

12     34.    Each of the defendants is sued individually as a conspirator and aider and abettor, as
13  well as in his or her capacity as an officer, director and/or auditor of Juniper, and the liability of each
14  arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes or
15  transactions complained of herein.

16  **THE FIDUCIARY DUTIES OF JUNIPER'S DIRECTORS AND OFFICERS**

17     35.    As Juniper's directors and officers, defendants owed Juniper fiduciary duties,
18  including duties of good faith, fair dealing, honesty and loyalty, in the performance of their
19  responsibilities with respect to the management and administration of the affairs of Juniper, as well
20  as the duty of full and candid disclosure of all material facts related thereto.

21     36.    In addition, defendants owed to Juniper the duty to ensure that its shareholder reports
22  about the Company and its business and finances were accurate, complete and truthful and not in any
23  way false and/or materially misleading. The conduct of Juniper's executives who engaged in
24  unlawful insider trading in violation of the securities laws, as well as their fiduciary duties of good
25  faith and loyalty, has been ratified by Juniper's Board of Directors, which failed to take action
26  against them.

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

37. To discharge their duties, defendants were required to exercise good faith and reasonable diligence in the supervision of Juniper's business and financial affairs. By virtue of these obligations, defendants were required, among other things:

(a) to, in good faith, manage, conduct, supervise, and direct the business and affairs of Juniper in good faith in accordance with state and federal laws and regulations and the Articles of Incorporation and By-Laws of Juniper;

(b) to exercise reasonable control and supervision over the officers and employees of Juniper;

(c) to exercise good faith in evaluation of the prudence and soundness of policies and practices proposed to be undertaken by Juniper;

(d) to ensure that Juniper did not engage in unsafe, imprudent, or unsound practices and that Juniper complied with all applicable laws and regulations;

(e) to establish guidelines and policies adequately governing the structure and organization of the Company's operations;

(f) to establish guidelines and policies adequately governing Juniper's stock option accounting and stock option granting practices;

(g) to maintain a proper division of authority and responsibility among the officers and directors of Juniper so as to prevent the dominance of any officer or director in the conduct of the business and affairs of Juniper;

(h) to ensure that Juniper did not engage in unsafe, imprudent, or unsound practices and to become and remain informed as to how Juniper was, in fact, operating;

(i) to maintain and implement an adequate and functioning system of internal financial and accounting controls, such that Juniper's assets would be safeguarded, its financial statements and information would be accurately recorded and reported, and corporate managers would be given prompt notice of serious problems or divergences so that risk to the corporation would be minimized; and

(j) to supervise the preparation and filing of financial results and financial statements required by law from Juniper, including the Company's SEC reports, and to examine and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 11 -

1  evaluate any reports of examination, audits or other information required by law concerning the

2  financial condition of Juniper and to make full and accurate disclosure of all material facts

3  concerning, among other things, each of the subjects and duties set forth above.

4      38.    At all relevant times, defendants occupied positions with Juniper or were associated

5  with the Company in such a manner as to make them privy to confidential proprietary information

6  concerning Juniper's business and finances, as well its accounting and stock option granting

7  practices, and present and future business prospects. Because of these positions and such access,

8  each of these defendants knew or recklessly disregarded that the adverse facts specified herein had

9  not been disclosed to and were being concealed from the public.

10                    **FACTUAL ALLEGATIONS**

11      39.    During the late 1990s and 2000s, Juniper enjoyed rapid growth in both sales and the

12  size of its operations. To recruit and retain key employees, Juniper, at the direction of its Board of

13  Directors, made liberal use of stock options as a form of compensation. Each option gave the

14  recipient the right to buy one share of Juniper common stock from the Company at a set price, called

15  the "exercise" or "strike" price, on a future date after the option vested. The option was "in-the-

16  money" whenever the trading price of Juniper common stock exceeded the option's exercise price.

17  The option was "at-the-money" whenever the trading price of Juniper common stock and the

18  exercise price were the same. The option was "out-of-the-money" or "underwater" whenever the

19  trading price of Juniper common stock was less than the exercise price. Throughout the relevant

20  period, defendants represented that Juniper's option grants were made at fair market value, *i.e.*, the

21  closing price of Juniper common stock on the date of grant.

22  **The Juniper Stock Option Plans**

23      40.    At all relevant times, stock options grants to Juniper executives were made under the

24  Company's Amended and Restated 1996 Stock Option Plan ("1996 Plan") and 2000 Nonstatutory

25  Stock Option Plan ("2000 Plan"). The basic terms of the 1996 and 2000 Plans remained unchanged

26  during the period of time between the Company's IPO in 1996 and the first disclosure of the stock

27  option scheme detailed herein. According to the nondiscretionary terms of the 1996 Plan, the

28  exercise price of incentive stock options and nonstatutory stock options intended to qualify as

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                         - 12 -

performance-based options under §162(m) of the Internal Revenue Code shall be no less than 100% of the fair market value of Juniper common stock on the date of grant.

Option Exercise Price and Consideration

(a)    The per share exercise price for the Shares to be issued upon exercise of an Option shall be such price as is determined by the Administrator, but shall be subject to the following:

(i)    In the case of an Incentive Stock Option

(A)    granted to an Employee who, at the time of grant of such Option, owns stock representing more than ten percent (10%) of the voting power of all classes of stock of the Company . . . . , the per Share exercise price shall be no less than 110% of the Fair Market Value per Share on the date of grant.

(B)    granted to any other Employee, the per Share exercise price shall be no less than 100% of the Fair Market Value per Share on the date of grant.

(ii)    . . . In the case of a Nonstatutory Stock Option intended to qualify as "performance-based compensation" within the meaning of Section 162(m) of the Code, the per Share exercise price shall be no less than 100% of the Fair Market Value per Share on the date of grant.

41.    While defendants disclosed that nonstatutory stock options issued under the 1996 and 2000 Plans may be granted at an exercise price of less than 100% of fair market value, they expressly disclaimed ever doing so. For example, in discussing stock option grants made to Juniper executives in the Company's 2000-2006 proxy statements, defendants Kriens, Stensrud, Sindhu, Hearst, Sclavos (2000-2006), Levy (2002-2006), Calderoni (2003-2006), Goldman (2003-2006) and Marshall (2004-2006) represented that "[s]tock options are granted at market price on the date of grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price." 2000 Proxy at 15-16; 2001 Proxy at 16; 2002 Proxy at 19; 2003 Proxy at 19; 2004 Proxy at 24; 2005 Proxy at 25-26; 2006 Proxy at 31.

42.    Likewise, in discussing the pricing of nonstatutory option grants issued under the 1996 and 2000 Plans during the preceding fiscal years in Juniper's 2000-2005 annual reports on Form 10-K, defendants Kriens, Sindhu, Hearst, Sclavos, Stensrud, Gani (2000-2003), Calderoni (2003-2005), Goldman (2003-2005), Marshall (2004-2005) and Dykes (2004-2005) represented that "no nonstatutory stock options have been granted for less than fair market value on the date of

1  grant." 2000 Form 10-K at 16; 2001 Form 10-K at 24; 2002 Form 10-K at 58-59; 2003 Form 10-K

2  at 58; 2004 Form 10-K at 64; 2005 Form 10-K at 69-70.

3      43.    The stated purpose of the 1996 and 2000 Plans was to attract and retain the best

4  available personnel for positions of substantial responsibility and to provide incentives to such

5  personnel to promote the success of Juniper and its business. *See* 1996 Plan, ¶1 ("The purposes of

6  this Stock Plan are to attract and retain the best available personnel for positions of substantial

7  responsibility, to provide additional incentives to Employees and Consultants of the Company and

8  its Subsidiaries and to promote the success of the Company's business."); 2000 Plan, ¶1 ("The

9  purposes of this Stock Plan are to attack and retain the best available personnel for positions of

10  substantial responsibility, to provide additional incentive to Employees and Consultants of the

11  Company and its Subsidiaries and to promote the success of the Company's business.").

12  **Juniper's By-Laws**

13      44.    At all relevant times, the By-Laws of Juniper authorized the Board of Directors or

14  Compensation Committee to act formally on option grant proposals one of two ways: The Board of

15  Directors or Compensation Committee could act without a formal meeting if all members of the

16  Board or Committee consented in writing to the adoption of a resolution authorizing the action. This

17  is "unanimous written consent." Alternatively, the Board of Directors or Compensation Committee

18  could act by holding a meeting at which a quorum of the Board or Committee members is present, if

19  a majority of those present at the meeting approve the action.

20      45.    For some of the Juniper option grants made during the relevant period, the Board of

21  Directors and/or Compensation Committee acted through unanimous written consents, and not

22  through a formal meeting of the Board of Directors or Compensation Committee members.

23  **Backdated Stock Option Grants at Juniper**

24      46.    A review of the annual stock option grants to directors and top officers of Juniper

25  during period of time between at least 1999 and 2003 shows that the stock option grants were dated:

26  (i) near or on the very day that Juniper stock hit its low price for the month and/or quarter; or (ii) in

27  advance of sharp stock price increases.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1        47.    This astonishing multi-year pattern of stock option grants on dates with highly

2    favorable exercise prices – at or near a periodic low, or preceding a sharp increase in the share

3    price – indicates that the purported grant dates of stock options were not the actual dates on which

4    the option grants were made.  Rather, the pattern indicates that the grants were repeatedly backdated

5    to dates with exceedingly low stock prices.  Indeed, the exercise price of many of the grants to

6    defendants in the relevant period was below the weighted average price of the stock in the

7    corresponding year.

8        48.    As demonstrated below, year after year, stock options were granted at different times

9    of the year with the only consistency being that the grants were at or near a periodic low or preceded

10    a run-up in the share price.

11    **October 4, 1999 Backdated Option Grant**

12        49.    During 1999, the public trading price of Juniper common stock ranged from a price of

13    $5.67 to $59.08 per share, with a weighted average closing price of $35.72.[1]  A total of 4,470,000

14    options were purportedly granted on October 4, 1999 to at least four Juniper executives, including its

15    Chairman and CEO, defendant Kriens.  The exercise price was $30.35 per share, which is $5.37 less

16    than the weighted average closing price for the fiscal year.  The price of the stock 20 trading days

17    after the grant was $44.76 per share, for a 20-day cumulative return based on the exercise price of

18    47.5%. The exercise price was the lowest closing price for the month of October 1999 and the entire

19    quarter.  A graph demonstrating the timing of this grant follows below:

20

21

22

23

24

25

26
_____

27    [1]        All exercise prices, number of options and stock prices are adjusted for splits and dividends
and rounded to two decimal points.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14



**Juniper Networks Incorporated**
September 3, 1999 to November 4, 1999

| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value at Date of Grant | Total Grant Value 20 Trading Days After Grant |
|------|-----------|------------------------|----------------|------------------------------------|-----------------------------------------------|
| 10/04/99 | Kriens | 1,800,000 | $30.35 | $54,637,560 | $80,568,720 |
| 10/04/99 | Sindhu | 1,080,000 | $30.35 | $32,782,536 | $48,341,232 |
| 10/04/99 | Gani | 480,000 | $30.35 | $14,570,016 | $21,484,992 |
| 10/04/99 | Wexler | 480,000 | $30.35 | $14,570,016 | $21,484,992 |

**May 11, 2000 Backdated Option Grant**

50.    During 2000, the public trading price of Juniper common stock ranged from a price of $51.29 to $243.00 per share, with a weighted average closing price of $141.20. A total of 40,000 options were purportedly granted on May 11, 2000 to defendant Sclavos. The exercise price was $74.00 per share, which is $67.20 less than the weighted average closing price for the fiscal year. The price of the stock 20 trading days after the grant was $112.03 per share, for a 20-day cumulative return based on the exercise price of 51.4%. The exercise price was the lowest closing price for the month of May 2000 and the entire quarter. A graph demonstrating the timing of this grant follows below:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14



**Juniper Networks Incorporated**
April 11, 2000 to June 12, 2000

15

| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value at Date of Grant | Total Grant Value 20 Trading Days After Grant |
|------|-----------|------------------------|----------------|-----------------------------------|----------------------------------------------|
| 05/11/00 | Sclavos | 40,000 | $74.00 | $2,960,000 | $4,481,252 |

16
17
18

**December 21, 2000 Backdated Option Grant**

19    51.    A total of 800,000 options were purportedly granted on December 21, 2000 to at least

20 four Juniper executives, including its Chairman and CEO, defendant Kriens. The exercise price was

21 $93.94 per share, which is $47.26 less than the weighted average closing price for the fiscal year.

22 The price of the stock 20 trading days after the grant was $135.67 per share, for a 20-day cumulative

23 return based on the exercise price of 44.4%. The exercise price was the lowest closing price for the

24 month of December 2000 and the entire quarter. A graph demonstrating the timing of this grant

25 follows below:

26
27
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15
16
17
18

| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value at Date of Grant | Total Grant Value 20 Trading Days After Grant |
|------|-----------|-----------------------|----------------|-----------------------------------|-----------------------------------------------|
| 12/21/00 | Kriens | 400,000 | $93.94 | $37,575,000 | $54,268,760 |
| 12/21/00 | Sindhu | 100,000 | $93.94 | $9,393,700 | $13,567,190 |
| 12/21/00 | Gani | 100,000 | $93.94 | $9,393,700 | $13,567,190 |
| 12/21/00 | Wexler | 100,000 | $93.94 | $9,393,700 | $13,567,190 |

19
20
21
22
23
24
25
26
27
28

**February 28, 2002 Backdated Option Grant**

52.    During 2002, the public trading price of Juniper common stock ranged from a price of $9.86 to $21.99 per share, with a weighted average closing price of $4.43. A total of 1,500,000 options were purportedly granted on February 28, 2002 to defendant Carney. The exercise price was $9.32 per share. The price of the stock 20 trading days after the grant was $12.62 per share, for a 20-day cumulative return based on the exercise price of 35.4%. The exercise price was the lowest closing price for the month of February 2002 and the entire quarter. A graph demonstrating the timing of this grant follows below:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value at Date of Grant | Total Grant Value 20 Trading Days After Grant |
|------|-----------|------------------------|----------------|-------------------------------------|-----------------------------------------------|
| 02/28/02 | Carney | 1,500,000 | $9.32 | $13,980,000 | $18,930,000 |

**July 1, 2002 Backdated Option Grant**

53.    A total of 1,930,000 options were purportedly granted on July 1, 2002 to several Juniper executives, including its Chairman and CEO, defendant Kriens.  The exercise price was $5.69 per share.  The price of the stock 20 trading days after the grant was $8.48 per share, for a 20-day cumulative return based on the exercise price of 49%.   The exercise price was the lowest closing price for the month of July 2002.  A graph demonstrating the timing of this grant follows below:

16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14



**Juniper Networks Incorporated**
May 31, 2002 to August 1, 2002

15

| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value at Date of Grant | Total Grant Value 20 Trading Days After Grant |
|---|---|---|---|---|---|
| 07/01/02 | Kriens | 550,000 | $5.69 | $3,129,500 | $4,664,000 |
| 07/01/02 | Gani | 500,000 | $5.69 | $2,845,000 | $4,240,000 |
| 07/01/02 | Sindhu | 300,000 | $5.69 | $1,707,000 | $2,544,000 |
| 07/01/02 | Krishnamurthi | 80,000 | $5.69 | $455,200 | $678,400 |

**April 3, 2003 Backdated Option Grant**

54.    A total of 37,500 options were purportedly granted on April 3, 2003 to defendant Krishnamurthi.  The exercise price was $8.16 per share, which is $1.86 less than the weighted average closing price for the fiscal year.  The price of the stock 20 trading days after the grant was $11.15 per share, for a 20-day cumulative return based on the exercise price of 36.6%. The exercise price was the lowest closing price for the month of April 2003 and the entire quarter.  A graph demonstrating the timing of this grant follows below:



**Juniper Networks Incorporated**
March 7, 2003 to May 5, 2003

| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value at Date of Grant | Total Grant Value 20 Trading Days After Grant |
|------|-----------|------------------------|----------------|------------------------------------|-----------------------------------------------|
| 04/03/03 | Krishnamurthi | 37,500 | $8.16 | $306,000 | $418,125 |

**September 26, 2003 Backdated Option Grant**

55.     A total of 2,350,000 options were purportedly granted on September 26, 2003, to at least four Juniper executives, including its Chairman and CEO, defendant Kriens. The exercise price was $15.00 per share. The price of the stock 20 trading days after the grant was $16.49 per share, for a 20-day cumulative return based on the exercise price of 9.9%. The exercise price was the lowest closing price for the month of September 2003. A graph demonstrating the timing of this grant follows below:



**Juniper Networks Incorporated**
August 26, 2003 to October 27, 2003

| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value at Date of Grant | Total Grant Value 20 Trading Days After Grant |
|------|-----------|------------------------|----------------|------------------------------------|-----------------------------------------------|
| 09/26/03 | Kriens | 800,000 | $15.00 | $12,000,000 | $13,192,000 |
| 09/26/03 | Gani | 500,000 | $15.00 | $7,500,000 | $8,245,000 |
| 09/26/03 | Sindhu | 300,000 | $15.00 | $4,500,000 | $4,947,000 |
| 09/26/03 | Krishnamurthi | 250,000 | $15.00 | $3,750,000 | $4,122,500 |

56.    The Company has admitted that "[t]here were numerous instances in which grants were chosen with the benefit of hindsight," *i.e.*, backdating the date of issuance of the executive stock options, which is directly contradicted by the public disclosures in Juniper's 2000-2005 annual reports on Form 10-K that incentive and nonstatutory options were granted at exercise prices of not less than 100% of the fair market value of Juniper common stock on the date of grant. The backdating of stock option grants constitutes a breach of defendants' fiduciary duties of good faith and loyalty owed to Juniper and its shareholders and violated the federal securities laws.

57.     The backdating scheme, among other things, enabled defendants to disguise the fact that the Company was paying higher compensation to executives and employees by awarding them in-the-money options, and to avoid having to expense the in-the-money portion as compensation expense and thus avoid reductions in the Company's net income or increases in its net losses. Keeping the scheme secret also hid the injury to the Company which occurred when executives and employees exercised the options and made capital contributions to Juniper, that were less than they should have paid, had the options not been granted in-the-money.

## DEFENDANTS' CONCEALMENT OF THEIR MISCONDUCT

58.     The stock option backdating scheme at Juniper began in 1999 and continued seamlessly until early 2006. As a part of the scheme, incentive stock option grants were made to executives at Juniper with prices less than the fair market value of Juniper common stock on the date of grant. To conceal the favorable pricing of executive grants, defendants caused Juniper to state in proxy statements and SEC reports that incentive and nonstatutory option grants were made with exercise prices equal to 100% of the fair market value of Juniper common stock on the date of grant. To further conceal their seamless scheme, defendants caused Juniper to publish false financial statements that materially understated compensation expense, thereby materially overstating the Company's net income and materially understating its net loss.

**False and Misleading Proxy Statements**

59.     Defendants caused Juniper to send shareholders proxy statements in connection with the Company's annual shareholders' meetings during the relevant period. Defendants drafted, approved and/or signed all of Juniper's proxy statements during that period. Defendants prepared and/or reviewed each proxy statement between 2000 and 2006 before the statements were filed with the SEC. Defendants knowingly and deliberately sent false and misleading proxy statements to Juniper shareholders.

60.     The Juniper proxy statements that were sent to shareholders by defendants annually in connection with annual shareholders' meetings typically concerned the election of directors, the approval and adoption of Juniper's stock option plan and authorization to reserve shares for future issuance under the stock option plans, and ratification of the selection of Juniper's auditor. Each

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    proxy statement sent to shareholders during this period contained materially false and misleading

2    disclosures or omitted information about Juniper's stock option practices, as detailed below.

3    **2000 Proxy Statement**

4          61.    On or about April 13, 2000, the Juniper Board of Directors, consisting of defendants

5    Kriens, Stensrud, Sindhu, Khosla and Hearst, issued the Company's 2000 Proxy Statement.

6          62.    In the proxy statement, defendants made the following representations regarding the

7    duties and responsibilities of the Compensation Committee which include making recommendations

8    to the full Board regarding executive compensation:

9            The Committee is responsible for setting and administering the policies governing
       annual compensation of executive officers, considers their performance and makes
10   recommendations regarding their cash compensation and stock options to the full
       Board of Directors.

11

12         63.    Further, the Juniper Board of Directors, through its Compensation Committee

     (Khosla and Stensrud), made the following representations regarding the Company's compensation
13

     policy and stock option plans:
14

15           The Committee's approach is predicated upon the philosophy that a
       substantial portion of aggregate annual compensation for executive officers should be
16   contingent upon the Company's performance and an individual's contribution to the
       Company's success in meeting certain critical objectives. In addition, the Committee
       strives to align the interests of the Company's executive officers with the long-term
17   interests of stockholders through stock option grants such that grants of stock options
       should relate the performance of the executive to the market perception of the
18   performance of the Company.

19                  *     *     *

20           Stock Option Grants. . . . Stock options are granted at market price on the
       date of grant and will provide value to the executive officers only when the price of
21   the Company's Common Stock increases over the exercise price.

22         64.    Each of the above statements concerning the purposes of Juniper's stock option plans

23   and the value of the stock options on the date of grant were knowingly false and misleading because

24   Juniper had, in fact, backdated option grants to defendant Kriens and other Juniper insiders, which

25   was not permitted by Juniper's stock option plans. Contrary to the above representations, none of

26   the manipulated options to defendants and others were ever approved by the shareholders, nor were

27   shareholders ever aware of this illicit compensation.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**2001 Proxy Statement**

65.    On or about March 31, 2001, the Juniper Board of Directors, consisting of defendants Kriens, Sclavos, Stensrud, Sindhu, Khosla and Hearst, issued the Company's 2001 Proxy Statement. In the proxy statement, defendants made the following representations regarding the duties and responsibilities of the Compensation Committee which include making recommendations to the full Board regarding executive compensation:

> The Compensation Committee is responsible for setting and administering the policies governing annual compensation of executive officers, considers their performance and makes recommendations regarding their cash compensation and stock options to the full Board of Directors.

66.    Further, the Juniper Board of Directors, through its Compensation Committee (Khosla and Stensrud), also made the following representations regarding the Company's compensation policy and stock option grants:

> The Compensation Committee's approach is predicated upon the philosophy that a substantial portion of aggregate annual compensation for executive officers should be contingent upon the Company's performance and an individual's contribution to the Company's success in meeting certain critical objectives. In addition, the Compensation Committee strives to align the interests of the Company's executive officers with the long-term interests of stockholders through stock option grants such that grants of stock options should relate the performance of the executive to the market perception of the performance of the Company.

> \*        \*        \*

> Stock options are granted at market price on the date of grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price.

67.    Each of the above statements concerning the purposes of Juniper's stock option plans and the value of the stock options on the date of grant were knowingly false and misleading because Juniper had, in fact, backdated option grants to defendant Kriens and other Juniper insiders, which was not permitted by Juniper's stock option plans. Contrary to the above representations, none of the manipulated options to defendants and others were ever approved by the shareholders, nor were shareholders ever aware of this illicit compensation.

**2002 Proxy Statement**

68.    On or about April 11, 2002, the Juniper Board of Directors, consisting of defendants Kriens, Sindhu, Hearst, Khosla, Sclavos and Stensrud, issued the Company's 2002 Proxy Statement.

1   In the proxy statement, defendants made the following representations regarding the duties and

2   responsibilities of the Compensation Committee which include making recommendations to the full

3   Board regarding executive compensation:

> The Compensation Committee is responsible for setting and administering the policies governing annual compensation of executive officers, considers their performance and makes recommendations regarding their cash compensation and stock options to the full Board of Directors.

69.     Defendants also made the following representations regarding the Audit Committee's (defendants Hearst and Sclavos) rule in recommending to the full Board the publication of the Company's annual financial statements:

> The Audit Committee oversees the Company's financial reporting process on behalf of the Board of Directors. . . .
>
> In fulfilling its oversight responsibilities, the Audit Committee reviewed with management the audited financial statements included in the Annual Report on Form 10-K for the year ended December 31, 2001, including a discussion of the acceptability and quality of the accounting principles, the reasonableness of significant judgments and the clarity of disclosures in the financial statements.
>
> *       *       *
>
> In reliance on the reviews and discussions referred to above, the Audit Committee recommended to the Board of Directors (and the Board has approved) that the audited financial statements be included in the Annual Report on Form 10-K for the year ended December 31, 2001 for filing with the Securities and Exchange Commission.

70.     Further, the Juniper Board of Directors, through its Compensation Committee (Khosla and Stensrud), made the following representations regarding the Company's compensation policy and stock option plans:

> The Compensation Committee's approach is predicated upon the philosophy that a substantial portion of aggregate annual compensation for executive officers should be contingent upon the Company's performance and an individual's contribution to the Company's success in meeting certain critical objectives. In addition, the Compensation Committee strives to align the interests of the Company's executive officers with the long-term interests of stockholders through stock option grants such that grants of stock options should relate the performance of the executive to the market perception of the performance of the Company.
>
> *       *       *
>
> Stock options are granted at market price on the date of grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

71.     Each of the above statements concerning the purposes of Juniper's stock option plans and the value of the stock options on the date of grant were knowingly false and misleading because Juniper had, in fact, backdated option grants to defendant Kriens and other Juniper insiders, which was not permitted by Juniper's stock option plans.  Contrary to the above representations, none of the manipulated options to defendants and others were ever approved by the shareholders, nor were shareholders ever aware of this illicit compensation.

**2003 Proxy Statement**

72.     On or about April 11, 2003, the Juniper Board of Directors, consisting of defendants Kriens, Sindhu, Hearst, Khosla, Levy, Sclavos, Stensrud and Gani, issued the Company's 2003 Proxy Statement.  In the proxy statement, defendants made the following representations regarding the duties and responsibilities of the Compensation Committee which include making recommendations to the full Board regarding executive compensation:

> The Compensation Committee is responsible for setting and administering the policies governing annual compensation of executive officers, considers their performance and makes recommendations regarding their cash compensation and stock options to the full Board of Directors.

73.     Defendants also made the following representations regarding the Audit Committee (defendants Hearst and Sclavos) and its members' role in the preparation and publication of Juniper's financial statements which misrepresented the Company's accounting for stock-based compensation:

> The Audit Committee oversees the Company's financial reporting process on behalf of the Board of Directors. . . .
>
> In fulfilling its oversight responsibilities, the Audit Committee reviewed with management the audited financial statements included in the Annual Report on Form 10-K for the year ended December 31, 2002, including a discussion of the acceptability and quality of the accounting principles, the reasonableness of significant judgments and the clarity of disclosures in the financial statements.
>
> *       *       *
>
> In reliance on the reviews and discussions referred to above, the Audit Committee recommended to the Board of Directors (and the Board has approved) that the audited financial statements be included in the Annual Report on Form 10-K for the year ended December 31, 2002 for filing with the Securities and Exchange Commission.

74.    Further, the Juniper Board of Directors, through its Compensation Committee (Khosla and Stensrud), made the following representations regarding the Company's compensation policy and stock option grants:

> The Compensation Committee's approach is predicated upon the philosophy that a substantial portion of aggregate annual compensation for executive officers should be contingent upon the Company's performance and an individual's contribution to the Company's success in meeting certain critical objectives. In addition, the Compensation Committee strives to align the interests of the Company's executive officers with the long-term interests of stockholders through stock option grants such that grants of stock options should relate the performance of the executive to the market perception of the performance of the Company.

> \*        \*        \*

> Stock Option Grants. . . . Stock options are granted at the fair market value on the date of grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price.

75.    Each of the above statements concerning the purposes of Juniper's stock option plans and the value of the stock options on the date of grant were knowingly false and misleading because Juniper had, in fact, backdated option grants to defendant Kriens and other Juniper insiders, which was not permitted by Juniper's stock option plans.  Contrary to the above representations, none of the manipulated options to defendants and others were ever approved by the shareholders, nor were shareholders ever aware of this illicit compensation.

**2004 Proxy Statement**

76.    On or about April 12, 2004, the Juniper Board of Directors, consisting of Kriens, Sindhu, Hearst, Goldman, Khosla, Sclavos, Stensrud, Calderoni and Levy, issued the Company's 2004 Proxy Statement.  In the proxy statement, defendants made the following representations regarding the duties and responsibilities of the Compensation Committee which include making recommendations to the full Board regarding executive compensation:

> The Compensation Committee is responsible for reviewing and approving the annual base salary, the annual incentive bonus, including the specific goals and amounts, equity compensation and other benefits or compensation arrangements of the Company's Chief Executive Officer and its other executive officers.

77.    Defendants also made the following representations regarding the Audit Committee and its members' role in the preparation and publication of Juniper's financial statements which misrepresented the Company's accounting for stock-based compensation:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 28 -

1           The Audit Committee oversees the Company's financial reporting process on behalf of the Board of Directors.

2

3                            \*       \*       \*

4           1.      The Audit Committee has reviewed and discussed the audited financial statements with the Company's management.

5                            \*       \*       \*

6           4.     . . . [T]he Audit Committee recommended to the Board, and the Board has approved, that the audited financial statements be included in Juniper Networks' Annual Report on Form 10-K for the fiscal year ended December 31, 2003, for filing with the Securities and Exchange Commission.

7

8   78.     Further, the Juniper Board of Directors, through its Compensation Committee (Stensrud, Khosla and Levy), made the following representations regarding the Company's compensation policy and stock option grants:

9

10

11

12          The Compensation Committee's approach is predicated upon the philosophy that a substantial portion of aggregate annual compensation for executive officers should be contingent upon the Company's overall performance and an individual's contribution to the Company's success in meeting certain critical objectives. In this regard, the Compensation Committee has tended to target lower levels of base salary relative to peer companies. In addition, the Compensation Committee's overall philosophy regarding compensation is to encourage creation of long-term value for stockholders, employee retention, and equity ownership through stock option grants. As the Compensation Committee applies these compensation philosophies in determining appropriate executive compensation levels and other compensation factors, the Compensation Committee reaches its decisions with a view towards maximizing the Company's overall performance.

13

14

15

16

17

18                           \*       \*       \*

19          Stock Option Grants. . . . Stock options are granted at the fair market value on the date of grant and will provide value to the executive officers only when the price of the Company's common stock increases over the exercise price.

20

21  79.     Each of the above statements concerning the purposes of Juniper's stock option plans

22  and the value of the stock options on the date of grant were knowingly false and misleading because

23  Juniper had, in fact, backdated option grants to defendant Kriens and other Juniper insiders, which

24  was not permitted by Juniper's stock option plans.  Contrary to the above representations, none of

25  the manipulated options to defendants and others were ever approved by the shareholders, nor were

26  shareholders ever aware of this illicit compensation.

27

28

1  **2005 Proxy Statement**

2      80.    On or about April 13, 2005, the Juniper Board of Directors, consisting of Kriens,

3  Sindhu, Hearst, Sclavos, Levy, Goldman, Stensrud, Calderoni and Marshall, issued the Company's

4  2005 Proxy Statement.  In the proxy statement, defendants made the following representations

5  regarding the duties and responsibilities of the Compensation Committee which include making

6  recommendations to the full Board regarding executive compensation:

7          The Compensation Committee is responsible for reviewing and approving the annual
           base salary, the annual incentive bonus, including the specific goals and amounts,
8          equity compensation and other benefits or compensation arrangements of the
           Company's Chief Executive Officer and its other executive officers.
9

10     81.    Defendants also made the following representations regarding the Audit Committee

11  and its members' role in the preparation and publication of Juniper's financial statements which

12  misrepresented the Company's accounting for stock-based compensation:

13         The Audit Committee oversees the Company's financial reporting process on
           behalf of the Board of Directors.

14                             *        *        *

15         1.    The Audit Committee has reviewed and discussed the audited
           financial statements with the Company's management.
16

17                             *        *        *

18         4.    . . . [T]he Audit Committee recommended to the Board, and the Board
           has approved, that the audited financial statements be included in Juniper Networks'
           Annual Report on Form 10-K for the fiscal year ended December 31, 2004, for filing
19         with the Securities and Exchange Commission.

20     82.    Further, the Juniper Board of Directors, through its Compensation Committee

21  (Stensrud, Marshall and Levy), also made the following representations regarding the Company's

22  compensation policy and stock option grants:

23         The Company provides its executive officers with a compensation package
           consisting of base salary, performance-based incentive pay, stock options and
24         participation in benefit plans generally available to other employees.  The
           Compensation Committee's intention is to adopt compensation programs that
25         encourage creation of long-term value for stockholders, employee retention, and
           equity ownership through stock option grants.  The Compensation Committee's
26         approach is predicated upon the philosophy that a substantial portion of aggregate
           annual compensation for executive officers should be contingent upon the
27         Company's overall performance and an individual's contribution to the Company's
           success in meeting certain critical objectives.
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

*    *    *

2    Stock options are granted at the fair market value on the date of grant and will
provide value to the executive officers only when the price of the Company's
3    common stock increases over the exercise price.

4    83.    Each of the above statements concerning the purposes of Juniper's stock option plans

5    and the value of the stock options on the date of grant were knowingly false and misleading because

6    Juniper had, in fact, backdated option grants to defendant Kriens and other Juniper insiders, which

7    was not permitted by Juniper's stock option plans.  Contrary to the above representations, none of

8    the manipulated options to defendants and others were ever approved by the shareholders, nor were

9    shareholders ever aware of this illicit compensation.

10    **2006 Proxy Statement**

11    84.    On or about April 13, 2006, the Juniper Board of Directors, consisting of Kriens,

12    Sindhu, Hearst, Sclavos, Levy, Goldman, Stensrud, Calderoni and Marshall, issued the Company's

13    2006 Proxy Statement.  In the proxy statement, defendants made the following representations

14    regarding the duties and responsibilities of the Compensation Committee which include making

15    recommendations to the full Board regarding executive compensation:

16    The Compensation Committee is responsible for reviewing and approving the annual
base salary, the annual incentive bonus, including the specific goals and amounts,
17    equity compensation and other benefits or compensation arrangements of the
Company's Chief Executive Officer and its other executive officers.
18

19    85.    Defendants also made the following representations regarding the Audit Committee

20    and its members' role in the preparation and publication of Juniper's financial statements which

21    misrepresented the Company's accounting for stock-based compensation:

22    The Audit Committee oversees the Company's financial reporting process on
behalf of the Board of Directors.

23    *    *    *

24    1.    The Audit Committee has reviewed and discussed the audited
financial statements with the Company's management.
25

26    *    *    *

27    4.    . . . [T]he Audit Committee recommended to the Board, and the Board
has approved, that the audited financial statements be included in Juniper Networks'
Annual Report on Form 10-K for the fiscal year ended December 31, 2005, for filing
28    with the Securities and Exchange Commission.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 31 -

86.     Further, the Juniper Board of Directors, through its Compensation Committee (Stensrud, Marshall and Levy), also made the following representations regarding the Company's compensation policy and stock option grants:

> The Company provides its executive officers with a compensation package consisting of base salary, performance-based incentive pay, equity compensation and participation in benefit plans generally available to other employees. The Compensation Committee's intention is to adopt compensation programs that encourage creation of long-term value for stockholders, employee retention, and equity ownership through stock option grants. The Compensation Committee's approach is predicated upon the philosophy that a substantial portion of aggregate annual compensation for executive officers should be contingent upon the Company's overall performance and an individual's contribution to the Company's success in meeting certain critical objectives.

> *          *          *

> Stock options were granted at the fair market value on the date of grant and will provide value to the executive officers only when the price of the Company's common stock increases over the exercise price.

87.     Each of the above statements concerning the purposes of Juniper's stock option plans and the value of the stock options on the date of grant were knowingly false and misleading because Juniper had, in fact, backdated option grants to defendant Kriens and other Juniper insiders, which was not permitted by Juniper's stock option plans. Contrary to the above representations, none of the manipulated options to defendants and others were ever approved by the shareholders, nor were shareholders ever aware of this illicit compensation.

## JUNIPER'S FALSE FINANCIAL REPORTING IN VIOLATION OF GAAP, SEC REGULATIONS AND IRS RULES

88.     As a result of defendants' improper backdating of stock options, defendants caused Juniper to violate GAAP, SEC regulations, and IRS rules and regulations.

89.     Juniper's financial results for 1999 through 2006 were included in reports filed with the SEC and in other shareholder reports. In these reports, defendants represented that Juniper's financial results were presented in a fair manner and in accordance with GAAP.

90.     Defendants' representations regarding Juniper's financial results were false and misleading because those results were not prepared in conformity with GAAP and thus were not "a fair presentation" of the Company's financial condition and operations.

91.    GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC, which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate.

## JUNIPER'S RESTATEMENT IS AN ADMISSION OF FALSITY

92.    As detailed above, the fact that Juniper has revised and restated its net income and net losses is an admission that the financial statements originally issued were false when they were reported and that the misstatements were material.

93.    Pursuant to GAAP, as set forth in Accounting Principles Board Opinion No. 20 ("APB 20"), the type of restatements and revisions announced by Juniper were to correct for material errors in previously issued financial statements. APB 20, ¶¶7-13. The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when the restatement occurs. *Id.*, ¶14. Thus, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.*, when there is a change in the reporting entity, there is a change in accounting principles used, or to correct an error in previously issued financial statements. Juniper's restatements and revisions are not due to a change in reporting entity or a change in accounting principle, but rather due to errors in previously issued financial statements. Thus, the restatements and revisions are an admission by Juniper that its previously issued financial results and its public statements regarding those results were false and misleading.

**Violations of GAAP**

94.    During the relevant period, defendants caused the Company to understate its compensation expense by not properly accounting for its stock options under GAAP and thus overstated the Company's net earnings.

95.    At all relevant times, defendants represented that Juniper accounted for stock options in accordance with Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 33 -

1  Employees" ("APB 25"): "The Company has elected to follow APB 25 and related interpretations in

2  accounting for its employee stock-based compensation plans.  Because the exercise price of the

3  Company's employee stock options equals the market price of the underlying stock of the date of

4  grant, no compensation expense is recognized." 1999-2005 Forms 10-K.

5       96.    Under well-settled accounting principles in effect throughout the relevant period,

6  Juniper did not need to record an expense for options granted to employees at the current market

7  price (at-the-money). The Company was, however, required to record an expense in its financial

8  statements for any options granted below the current market price (in-the-money).  In order to

9  provide Juniper executives and employees with far more lucrative in-the-money options, while

10 avoiding having to inform shareholders about millions of dollars incurred by the Company in

11 compensation expenses (and without paying the IRS millions of dollars in employment taxes),

12 defendants systematically falsified Company records to create the false appearance that options had

13 been granted at the market price on an earlier date.

14      97.    Throughout the relevant period, Juniper accounted for stock options using the

15 intrinsic method described in APB 25, "Accounting for Stock Issued to Employees." Under APB

16 25, employers were required to record as an expense on their financial statements the "intrinsic

17 value" of a fixed stock option on its "measurement date."  An option that is in-the-money on the

18 measurement date has intrinsic value, and the difference between its exercise price and the quoted

19 market price must be recorded as compensation expense to be recognized over the vesting period of

20 the option.  Options that are at-the-money or out-of-the-money on the measurement date need not be

21 expensed.  Excluding non-employee directors, APB 25 required employers to record compensation

22 expenses on options granted to non-employees irrespective of whether they were in-the-money or

23 not on the date of grant.

24 **Juniper's GAAP Violations Were Material**

25      98.    Juniper's false and misleading relevant period statements and omissions regarding its

26 accounting were material, particularly in light of SEC guidance on materiality.  SEC Staff

27 Accounting Bulletin ("SAB") Topic 1M, Materiality, summarizes GAAP definitions of materiality.

28 Among other items, SAB Topic 1M says: "A matter is 'material' if there is a substantial likelihood

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    that a reasonable person would consider it important." It also stresses that materiality requires

2    qualitative, as well as quantitative, considerations. For example, if a known misstatement would

3    cause a significant market reaction, that reaction should be taken into account in determining the

4    materiality of the misstatement.

5        99.    SAB Topic 1M further states:

6            Among the considerations that may well render material a quantitatively
         small misstatement of a financial statement item are –

7

8                        *        *        *

9    •    whether the misstatement masks a change in earnings or other trends

10   •    whether the misstatement hides a failure to meet analysts' consensus
         expectations for the enterprise

11                       *        *        *

12   •    whether the misstatement concerns a segment or other portion of the
         registrant's business that has been identified as playing a significant role in
13       the registrant's operations or profitability.

14       100.   SAB Topic 1M also says that an intentional misstatement of even immaterial items

15   may be illegal and constitute fraudulent financial reporting.

16       101.   Juniper's misstatements satisfy these criteria and thus were material from both a

17   quantitative and qualitative perspective.

18   **Juniper's Financial Statements Violated**
     **Fundamental Concepts of GAAP**
19

20       102.   Due to these accounting improprieties, the Company presented its financial results

     and statements in a manner that violated GAAP, which are described by the following statements:
21

22           (a)    The principle that interim financial reporting should be based upon the same

23   accounting principles and practices used to prepare annual financial statements (Accounting

     Principles Board Opinion No. 28, ¶10);
24

25           (b)    The principle that financial reporting should provide information that is useful

26   to existing and potential investors and creditors and other users in making rational investment, credit

     and similar decisions (Financial Accounting Standards Board ("FASB") Statement of Concepts
27

     No. 1, ¶34);
28

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶40);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)    The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

(f)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79); and

(g)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶95, 97).

103.    Further, the undisclosed adverse information concealed by defendants during the relevant period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## FALSE AND MISLEADING ANNUAL REPORTS ON FORM 10-K

### 1999 Form 10-K

104.    On or about March 29, 2000, Juniper filed its 1999 Report on Form 10-K with the SEC.  The annual report was signed by defendants Kriens, Gani, Sindhu, Hearst, Khosla and Stensrud.  The Form 10-K included Juniper's financial statements for the period ended December 31, 1999, which were materially false and misleading and presented in violation of GAAP, due to

improper accounting for backdated stock options grants. As a result, Juniper's compensation expense was materially understated and its net loss was materially understated.

105. In addition, the 1999 Report on Form 10-K included the following representations regarding the exercise price of options granted under Juniper's 1996 Plan:

> Juniper Networks' 1996 Stock Option Plan (the Plan) provides for the granting of incentive stock options to employees and nonstatutory stock options to employees, directors and consultants. Incentive stock options are granted at an exercise price of not less than the fair value per share of the common stock on the date of grant. Nonstatutory stock options may be granted at an exercise price of not less than 85% of the fair value per share on the date of grant; however, no statutory stock options have been granted for less than fair market value on the date of grant.

106. As detailed above, this was knowingly false and misleading because stock options were granted with an exercise price less than that of the date on which the options were actually granted.

107. Further, as to the accounting treatment applied to Juniper's stock option plans, defendants further falsely represented that:

> The Company has elected to follow APB 25 and related interpretations in accounting for its employee stock-based compensation plans. Because the exercise price of Juniper Networks' employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense was recognized.

108. This statement was false because, as Juniper recently acknowledged, the Company did not report the excess compensation expense arising from backdated stock option grants to Juniper insiders.

**2000 Form 10-K**

109. On or about March 27, 2001, Juniper filed its 2000 Report on Form 10-K with the SEC. The annual report was signed by defendants Kriens, Gani, Sindhu, Hearst, Khosla, Sclavos and Stensrud. The Form 10-K included Juniper's financial statements for the period ended December 31, 2000, which were materially false and misleading and presented in violation of GAAP, due to improper accounting for backdated stock options grants. As a result, Juniper's compensation expense was materially understated and its net loss was materially understated.

110. In addition, the 2000 Report on Form 10-K included the following representations regarding the exercise price of options granted under Juniper's 1996 and 2000 Plans:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 37 -

The Company's Amended and Restated 1996 Stock Option Plan (the "1996 Plan") provides for the granting of incentive stock options to employees and nonstatutory stock options to employees, directors and consultants. Incentive stock options are granted at an exercise price of not less than the fair value per share of the common stock on the date of grant. Nonstatutory stock options may be granted at an exercise price of not less than 85% of the fair value per share on the date of grant; however, no nonstatutory stock options have been granted for less than fair market value on the date of grant.

*        *        *

In July 2000, the Board of Directors adopted the Juniper Networks 2000 Nonstatutory Stock Option Plan (the "2000 Plan"). The 2000 Plan provides for the granting of nonstatutory stock options to employees, directors and consultants. Nonstatutory stock options may be granted at an exercise price of not less than 85% of the fair value per share on the date of grant; however, no nonstatutory stock options have been granted for less than fair market value on the date of grant. Vesting and exercise provisions are determined by the Board of Directors.

111.    As detailed above, this was knowingly false and misleading because stock options were granted with an exercise price less than that of the date on which the options were actually granted

112.    Further, as to the accounting treatment applied to Juniper's stock option plans, defendants further falsely represented that:

The Company has elected to follow APB 25 and related interpretations in accounting for its employee stock-based compensation plans. Because the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized.

113.    This statement was false because, as Juniper recently acknowledged, the Company did not report the excess compensation expense arising from backdated stock option grants to Juniper insiders.

**2001 Form 10-K**

114.    On or about April 1, 2002, Juniper filed its 2001 Report on Form 10-K with the SEC. The annual report was signed by defendants Kriens, Gani, Sindhu, Hearst, Khosla, Sclavos and Stensrud. The Form 10-K included Juniper's financial statements for the period ended December 31, 2001, which were materially false and misleading and presented in violation of GAAP, due to improper accounting for backdated stock options grants. As a result, Juniper's compensation expense was materially understated and its net loss was materially understated.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

115.    In addition, the 2001 Report on Form 10-K included the following representations regarding the exercise price options granted under Juniper's 1996 and 2000 Plans:

> The Company's Amended and Restated 1996 Stock Option Plan (the "1996 Plan") provides for the granting of incentive stock options to employees and nonstatutory stock options to employees, directors and consultants. Incentive stock options are granted at an exercise price of not less than the fair value per share of the common stock on the date of grant. Nonstatutory stock options may be granted at an exercise price of not less than 85% of the fair value per share on the date of grant; however, no nonstatutory stock options have been granted for less than fair market value on the date of grant.

*        *        *

> In July 2000, the Board of Directors adopted the Juniper Networks 2000 Nonstatutory Stock Option Plan (the "2000 Plan"). The 2000 Plan provides for the granting of nonstatutory stock options to employees, directors and consultants. Nonstatutory stock options may be granted at an exercise price of not less than 85% of the fair value per share on the date of grant; however, no nonstatutory stock options have been granted for less than fair market value on the date of grant.

116.    As detailed above, this was knowingly false and misleading because stock options were granted with an exercise price less than that of the date on which the options were actually granted.

117.    Further, as to the accounting treatment applied to Juniper's stock option plans, defendants further falsely represented that:

> The Company has elected to follow APB 25 and related interpretations in accounting for its employee stock-based compensation plans. Because the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized.

118.    This statement was false because, as Juniper recently acknowledged, the Company did not report the excess compensation expense arising from backdated stock option grants to Juniper insiders.

**2002 Form 10-K**

119.    On or about March 11, 2003, Juniper filed its 2002 Report on Form 10-K with the SEC. The annual report was signed by defendants Kriens, Gani, Sindhu, Hearst, Khosla, Sclavos and Stensrud. The Form 10-K included Juniper's financial statements for the period ended December 31, 2002, which were materially false and misleading and presented in violation of

1   GAAP, due to improper accounting for backdated stock options grants. As a result, Juniper's

2   compensation expense was materially understated and its net loss was materially understated.

3       120.    In addition, the 2002 Report on Form 10-K included the following representations

4   regarding the exercise price of options granted Juniper's 1996 and 2000 Plans:

5               Amended and Restated 1996 Stock Option Plan

6               The Company's Amended and Restated 1996 Stock Option Plan (the "1996
        Plan") provides for the granting of incentive stock options to employees and
7       nonstatutory stock options to employees, directors and consultants. Incentive stock
        options are granted at an exercise price of not less than the fair value per share of the
8       common stock on the date of grant. Nonstatutory stock options may be granted at an
        exercise price of not less than 85% of the fair value per share on the date of grant;
9       however, no nonstatutory stock options have been granted for less than fair market
        value on the date of grant.

10                              *       *       *

11              2000 Nonstatutory Stock Option Plan

12              In July 2000, the Board of Directors adopted the Juniper Networks 2000
13      Nonstatutory Stock Option Plan (the "2000 Plan"). The 2000 Plan provides for the
        granting of nonstatutory stock options to employees, directors and consultants.
14      Nonstatutory stock options may be granted at an exercise price of not less than 85%
        of the fair value per share on the date of grant; however, no nonstatutory stock
15      options have been granted for less than fair market value on the date of grant.

16      121.    As detailed above, this was knowingly false and misleading because stock options

17  were granted with an exercise price less than that of the date on which the options were actually

18  granted.

19      122.    Further, as to the accounting treatment applied to Juniper's stock option plans,

20  defendants further falsely represented that:

21              The Company has elected to follow APB 25 and related interpretations in
        accounting for its employee stock-based compensation plans. Because the exercise
22      price of the Company's employee stock options equals the market price of the
        underlying stock on the date of grant, no compensation expense is recognized.

23      123.    This statement was false because, as Juniper recently acknowledged, the Company

24  did not report the excess compensation expense arising from backdated stock option grants to

25  Juniper insiders.

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                        - 40 -

**2003 Form 10-K**

124. On or about February 20, 2004, Juniper filed its 2003 Report on Form 10-K with the SEC. The annual report was signed by defendants Kriens, Gani, Sindhu, Hearst, Khosla, Sclavos, Stensrud, Calderoni, Levy and Goldman. The Form 10-K included Juniper's financial statements for the period ended December 31, 2003, which were materially false and misleading and presented in violation of GAAP, due to improper accounting for backdated stock options grants. As a result, Juniper's compensation expense was materially understated and its net loss was materially understated.

125. In addition, the 2003 Report on Form 10-K included the following representations regarding the exercise price of options granted Juniper's 1996 and 2000 Plans:

Amended and Restated 1996 Stock Option Plan

The Company's Amended and Restated 1996 Stock Option Plan (the "1996 Plan") provides for the granting of incentive stock options to employees and nonstatutory stock options to employees, directors and consultants. Incentive stock options are granted at an exercise price of not less than the fair value per share of the common stock on the date of grant. Nonstatutory stock options may be granted at an exercise price of not less than 85% of the fair value per share on the date of grant; however, no nonstatutory stock options have been granted for less than fair market value on the date of grant.

\*        \*        \*

2000 Nonstatutory Stock Option Plan

In July 2000, the Board of Directors adopted the Juniper Networks 2000 Nonstatutory Stock Option Plan (the "2000 Plan"). The 2000 Plan provides for the granting of nonstatutory stock options to employees, directors and consultants. Nonstatutory stock options may be granted at an exercise price of not less than 85% of the fair value per share on the date of grant; however, no nonstatutory stock options have been granted for less than fair market value on the date of grant.

126. As detailed above, this was knowingly false and misleading because stock options were granted with an exercise price less than that of the date on which the options were actually granted.

127. Further, as to the accounting treatment applied to Juniper's stock option plans, defendants further falsely represented that:

The Company has elected to follow APB 25 and related interpretations in accounting for its employee stock-based compensation plans. Because the exercise

price of the Company's employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized.

128.    This statement was false because, as Juniper recently acknowledged, the Company did not report the excess compensation expense arising from backdated stock option grants to Juniper insiders.

**2004 Form 10-K**

129.    On or about March 4, 2005, Juniper filed its 2004 Report on Form 10-K with the SEC. The annual report was signed by defendants Kriens, Sindhu, Hearst, Sclavos, Stensrud, Dykes, Calderoni, Goldman, Levy and Marshall. The Form 10-K included Juniper's financial statements for the period ended December 31, 2004, which were materially false and misleading and presented in violation of GAAP, due to improper accounting for backdated stock options grants. As a result, Juniper's compensation expense was materially understated and its net loss was materially understated.

130.    In addition, the 2004 Report on Form 10-K included the following representations regarding the exercise price of stock options granted under Juniper's 1996 and 2000 Plans:

Amended and Restated 1996 Stock Option Plan

The Company's Amended and Restated 1996 Stock Option Plan (the "1996 Plan") provides for the granting of incentive stock options to employees and nonstatutory stock options to employees, directors and consultants. Incentive stock options are granted at an exercise price of not less than the fair value per share of the common stock on the date of grant. Nonstatutory stock options may be granted at an exercise price of not less than 85% of the fair value per share on the date of grant; however, no nonstatutory stock options have been granted for less than fair market value on the date of grant.

\*       \*       \*

2000 Nonstatutory Stock Option Plan

In July 2000, the Board of Directors adopted the Juniper Networks 2000 Nonstatutory Stock Option Plan (the "2000 Plan"). The 2000 Plan provides for the granting of nonstatutory stock options to employees, directors and consultants. Nonstatutory stock options may be granted at an exercise price of not less than 85% of the fair value per share on the date of grant; however, no nonstatutory stock options have been granted for less than fair market value on the date of grant.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

131.    As detailed above, this was knowingly false and misleading because stock options were granted with an exercise price less than that of the date on which the options were actually granted.

132.    Further, as to the accounting treatment applied to Juniper's stock option plans, defendants further falsely represented that:

> The Company has elected to follow APB 25 and related interpretations in accounting for its employee stock-based compensation plans. Because the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized, other than acquisition-related compensation costs.

133.    This statement was false because, as Juniper recently acknowledged, the Company did not report the excess compensation expense arising from backdated stock option grants to Juniper insiders.

**2005 Form 10-K**

134.    On or about March 7, 2006, Juniper filed its 2005 Report on Form 10-K with the SEC. The annual report was signed by defendants Kriens, Sindhu, Hearst, Sclavos, Stensrud, Dykes, Calderoni, Goldman, Levy and Marshall. The Form 10-K included Juniper's financial statements for the period ended December 31, 2005, which were materially false and misleading and presented in violation of GAAP, due to improper accounting for backdated stock options grants. As a result, Juniper's compensation expense was materially understated and its net loss was materially understated.

135.    In addition, the 2005 Report on Form 10-K included the following representations regarding the exercise price of stock options granted under Juniper's 1996 and 2000 Plans:

> Amended and Restated 1996 Stock Option Plan
>
> The Company's Amended and Restated 1996 Stock Option Plan (the "1996 Plan") provides for the granting of incentive stock options to employees and nonstatutory stock options to employees, directors and consultants. Incentive stock options are granted at an exercise price of not less than the fair value per share of the common stock on the date of grant. Nonstatutory stock options may be granted at an exercise price of not less than 85% of the fair value per share on the date of grant; however, no nonstatutory stock options have been granted for less than fair market value on the date of grant.

\*        \*        \*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

2000 Nonstatutory Stock Option Plan

In July 2000, the Board of Directors adopted the Juniper Networks 2000 Non-statutory Stock Option Plan (the "2000 Plan"). The 2000 Plan provides for the granting of non-statutory stock options to employees, directors and consultants. Non-statutory stock options may be granted at an exercise price of not less than 85% of the fair value per share on the date of grant; however, no non-statutory stock options have been granted for less than fair market value on the date of grant.

136.    As detailed above, this was knowingly false and misleading because stock options were granted with an exercise price less than that of the date on which the options were actually granted.

137.    Further, as to the accounting treatment applied to Juniper's stock option plans, defendants further falsely represented that:

The Company has elected to follow APB 25 and related interpretations in accounting for its employee stock-based compensation plans. Because the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized, other than acquisition-related compensation costs.

138.    This statement was false because, as Juniper recently acknowledged, the Company did not report the excess compensation expense arising from backdated stock option grants to Juniper insiders.

139.    The chart below illustrates Juniper's false and misleading annual fiscal financial results which materially understated its compensation expenses and thus overstated its earnings and/or understated its losses as follows:

| FISCAL YEAR | NET INCOME/LOSS | EARNINGS/LOSS PER SHARE |
|---|---|---|
| 1999 | ($9,034) | ($0.05) |
| 2000 | $147,916 | $0.49 |
| 2001 | ($13,417) | ($0.04) |
| 2002 | ($119,650) | ($0.34) |
| 2003 | $39,199 | $0.09 |
| 2004 | $135,746* | $0.28 |
| 2005 | $354,029* | $0.64 |

*    except as otherwise stated, in millions.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

140. As Juniper's CEO and CFO, defendants Kriens (CEO) and Dykes (CFO) also signed Sarbanes-Oxley Act of 2002 §302 certifications falsely stating that Juniper's fiscal year 2002-2005 Forms 10-K did not contain any material misstatements or omit material information and that the reports fairly presented in all material respects Juniper's financial condition and results of operations. These statements were untrue at the time they were made due to the unlawful stock option backdating scheme particularized herein. Among other things, defendants Kriens and Dykes knew that the certifications were false and misleading because he and his fellow Juniper executives had granted and/or received backdated option grants between at least 1999-2005, in direct violation of the Company's shareholder stock option plans.

141. Defendants Kriens and Dykes knew that these certifications were materially false and misleading. Juniper's financial statements for those years did not fairly present Juniper's financial condition because the Forms 10-K for at least 1999-2005 failed to account for defendants' in-the-money grants as compensation expense and thus, materially overstated net income or materially understated its net loss; and the Forms 10-K for at least 1999-2005 included materially false and misleading financial statements from previous years that understated compensation expenses due to earlier, disguised in-the-money option grants about which defendants knew and/or approved.

### DEFENDANTS' INSIDER SELLING

142. During the relevant period, certain defendants exercised many of their stock options permitting them to sell over $771.3 million worth of Juniper stock they obtained often by cashing in under-priced stock options:

| Defendant | Dates of Sales | Shares Sold | Proceeds Received |
|-----------|----------------|-------------|-------------------|
| Calderoni | 11/08/04-11/23/05 | 39,700 | $1,016,594 |
| Gani | 02/08/00-08/03/05 | 1,155,000 | $71,347,000 |
| Goldman | 08/25/04-08/03/05 | 14,000 | $360,230 |
| Hearst | 10/18/04-07/28/05 | 912,585 | $48,200,384 |
| Kriens | 07/18/00-10/26/05 | 7,789,116 | $272,998,261 |
| Krishnamurthi | 07/21/04-07/30/04 | 160,000 | $3,733,604 |
| Marshall | 05/18/04-05/17/06 | 208,080 | $4,587,604 |
| Sindhu | 02/08/00-02/08/06 | 4,930,000 | $188,573,017 |
| Stensrud | 02/22/00-10/31/05 | 582,600 | $39,555,866 |
| Wexler | 02/08/00-04/18/01 | 754,944 | $86,905,859 |
| **TOTAL** | | **16,546,025** | **$717,278,459** |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**ENTIRE FAIRNESS APPLIES**

143.    Because defendants both granted and received unlawfully backdated options, they stood on both sides of the transaction and their misconduct may not be sanctioned unless they bear their burden to demonstrate the entire fairness of the actions, a burden they cannot discharge.

144.    Because defendants' misconduct is to be scrutinized under the standard of entire fairness, defendants are not entitled to any presumption that their misconduct was taken in accordance with the proper exercise of business judgment.

145.    Because defendants' misconduct was in breach of their duty of loyalty and undertaken in bad faith, their misconduct cannot be shielded by any exculpatory provision in the Company's Articles of Incorporation that purports to limit defendants' liability for actions that violate their duty of care.

**DAMAGE TO JUNIPER**

146.    The backdating of stock option grants and issuance thereof in the amounts awarded to defendants caused, and continues to cause, substantial harm to Juniper. Backdating stock option grants represents a direct and continuing waste of valuable corporate assets. Because Juniper is the counterparty to the option contracts, when the defendants exercise their backdated options, money is siphoned on a dollar-for-dollar basis directly from Juniper. The result is that the backdated grants give the defendants an option to purchase Juniper shares directly from the Company at an unfair and improper low price, with the Company making up the difference.

147.    Backdating stock options also severely undermines the incentives that justify the use of stock options. Stock option compensation is intended to encourage management to maximize the return to shareholders by aligning the interests of management with those of shareholders. However, defendants caused themselves and their colleagues to receive stock option grants backdated to correspond to low points in the stock price. The backdating created a perverse incentive for defendants to engineer dips and volatile swings in the stock price. The option backdating also may cause Juniper to violate the Internal Revenue Code, since compensation from exercised stock options issued under the backdating scheme was likely nondeductible under §162(m) of the Internal Revenue Code.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

148.    On May 22, 2006, Juniper announced that the Company had received a request for information from the United States Attorney for the Eastern District of New York regarding its stock option grants. Next, on May 24, 2006, Company's counsel received a letter from the SEC indicating that the SEC was conducting an inquiry regarding Juniper's stock option granting practices. Then, on July 19, 2006, Juniper disclosed the preliminary results of its internal investigation, concluding that stock options grants to Juniper executives and employees had been manipulated. And, on August 10, 2006, the Company admitted that its previously issued financial statements were false and would be restated "to record additional non-cash charges for stock-based compensation expense related to past option grants."

149.    On December 20, 2006, Juniper announced the final results of its internal stock option investigation. In addition to confirming "that there were numerous instances in which grant dates were chosen with the benefit of hindsight as to the price of the Company's stock, so as to give favorable prices," the Company confirmed that its "CEO, Scott Kriens, received two stock option awards with measurement date issues." The Company further stated that it "currently anticipates that it will record additional non-cash charges for stock-based compensation expense of approximately $900 million."

150.    Then, on March 9, 2007, Juniper filed its 2006 annual report on Form 10-K with the SEC which restated the Company's previously issued financial statements and discussed the results of the stock option investigation. Key findings of the investigation include:

- There were numerous instances in which grant dates were chosen with the benefit of hindsight as to the price of our stock, so as to give favorable exercise prices. In this regard, the Audit Committee identified serious concerns regarding the actions of certain former management in connection with the stock option granting process

- Formal documentation of stock option grants often lagged the referenced grant date

- Grants were made by persons or committees who did not have the proper authority to make the grants in question

- Management failed to exercise sufficient responsibility for the stock option granting process

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Our CEO, Scott Kriens, received two stock option awards whose measurement dates for financial accounting purposes differ from the recorded grant dates for such awards.

## TOLLING OF APPLICABLE LIMITATION PERIODS

151.  The claims asserted herein are timely. As an initial matter, defendants wrongfully concealed their manipulation of Juniper's stock option plans by systematically issuing false and misleading proxy statements, by falsely reassuring Juniper's shareholders that Juniper's option grants were being administered by a committee of independent directors, and by failing to disclose that backdated options were, in fact, actually issued on dates other than those disclosed, and that strategically-timed option grants were issued based on the manipulation of insider information that ensured the true fair market value of the Company's stock was, in fact, higher than the publicly traded price on the date of the option grant.

152.  Juniper's shareholders had no reason to know of defendants' breach of their fiduciary duties until at least May 8, 2006, when it was announced that Juniper had commenced an internal investigation into its historical stock option practices and related accounting. Finally, as fiduciaries of Juniper and its shareholders, defendants cannot rely on any limitations defense where they withheld from Juniper's shareholders the facts that give rise to the claims asserted herein, *i.e.*, that the option grant dates to defendants had been manipulated to maximize the profit for the grant recipients.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

153.  Plaintiff incorporates ¶¶1-152.

154.  Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights.

155.  At the time this action was commenced, the Juniper Board of Directors consisted of nine directors: defendants Kriens, Sindhu, Stensrud, Levy, Hearst, Sclavos, Calderoni, Goldman and Marshall. Plaintiff has not made any demand on the Juniper Board to institute this action against defendants because such demand would be a futile and useless act. As particularized, at least a

1    majority of the Juniper Board is incapable of making an independent and disinterested decision to

2    institute and vigorously prosecute this action.

3    **Defendant Kriens**

4    156.    Defendant Kriens is interested in the transactions complained of herein because he

5    directly and financially benefited from the backdating of stock options.  Kriens, as Chairman and

6    CEO of Juniper, knowingly and deliberately participated in and approved the improper backdating of

7    stock options, and knowingly and deliberately participated in and approved the Company's filing of

8    false financial statements and other false SEC filings, as alleged herein, and therefore is substantially

9    likely to be held liable for the misconduct complained of herein.  Furthermore, Kriens' principal

10   occupation is his employment as CEO of the Company.  As CEO of the Company, Kriens stands to

11   earn millions of dollars in annual salary, bonuses, and other compensation, all of which must be

12   approved by defendants Stensrud, Levy and Marshall, who are current members of the

13   Compensation Committee.  Finally, Kriens exerts a tremendous degree of influence over the Board

14   through his role as Juniper's Chairman and CEO since October 1996 and through his longstanding

15   professional and personal relationships with defendants Stensrud and Sclavos as alleged herein.

16   Thus, at the time this suit was commenced, defendant Kriens was not capable of disinterestedly and

17   independently considering a pre-suit demand to commence this litigation.

18   157.    Kriens is directly interested in the stock option backdating scheme that is the subject

19   of this action.  Defendant Kriens received backdated stock options to purchase approximately 2.2

20   million shares of Juniper common stock.  In its 2006 Form 10-K, Juniper admits that "[o]ur CEO,

21   Scott Kriens, received two stock option awards whose measurement dates for financial accounting

22   purposes differ from the recorded grant dates for such awards."

23   158.    Moreover, as a member of the Board of Directors, Kriens also knowingly and

24   deliberately participated in and approved the improper backdating of stock options as the Company

25   has admitted that a number of the backdated grants were approved by the Board.

26   159.    Kriens also knowingly and deliberately approved the filing of and signed false

27   financial statements as alleged herein at ¶¶104-138, as well as false and misleading proxy statements

28   as alleged herein at ¶¶61-87.  Moreover, in connection with the 2000 Proxy Statement, Kriens

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    knowingly and intentionally misrepresented Juniper's compensation practices while simultaneously

2    seeking shareholder approval to increase the authorized number of Company shares from 200

3    million to 1 billion, in order to provide the necessary shares for, *inter alia*, "grants under employee

4    benefit and employee stock incentive plans." In connection with the 2001 Proxy Statement, Kriens

5    knowingly and intentionally misrepresented Juniper's compensation practices while simultaneously

6    asking shareholders to vote against a shareholder proposal that would have sought to limit the

7    Board's discretion to reprice stock options to a lower exercise price without approval of the

8    Company's shareholders. In connection with the 2005 Proxy Statement, Kriens knowingly and

9    intentionally misrepresented Juniper's compensation practices while simultaneously seeking

10    shareholder approval for the 2006 Equity Incentive Plan.

11        160.    In addition, Kriens' principal occupation since 1996 has been his employment with

12    Juniper through which he has received, and will continue to receive, millions of dollars in annual

13    salary, bonuses, and other compensation.

14        161.    Finally, Kriens is also incapable assessing a pre-suit demand independently of

15    defendants Stensrud and Sclavos due to their longstanding personal and professional relationships.

16    Kriens and Stensrud together co-founded StrataCom, Inc. ("StrataCom") in 1986 and worked there

17    together until at least 1992, eventually selling StrataCom to Cisco Systems, Inc. ("Cisco") in 1996

18    for $4 billion. Kriens and Sclavos have served together on the board of directors of VeriSign, Inc.

19    ("VeriSign") since 2001, where Sclavos has served as President and CEO since July 1995 and as

20    Chairman since December 2001. VeriSign has also been implicated in the option backdating scandal

21    and faces several lawsuits relating to conduct substantially similar to the backdating alleged herein.

22    **Defendant Sindhu**

23        162.    Defendant Sindhu is interested in the transactions complained of herein because he

24    directly and financially benefited from the backdating of stock options. Sindhu, as Vice Chairman

25    and Chief Technical Officer ("CTO") of Juniper, knowingly and deliberately participated in and

26    approved the improper backdating of stock options, and knowingly and deliberately participated in

27    and approved the Company's filing of false financial statements and other false SEC filings, as

28    alleged herein, and therefore is substantially likely to be held liable for the misconduct complained

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    of herein. Furthermore, Sindhu's principal occupation is his employment as Vice Chairman and
2    CTO of the Company. As Vice Chairman and CTO of the Company, Kriens has and stands to earn
3    millions of dollars in annual salary, bonuses, and other compensation, all of which must be approved
4    by defendants Stensrud, Levy and Marshall, who are current members of the Compensation
5    Committee. Sindhu is also incapable of considering a demand due to his longstanding professional
6    and personal relationships with defendants Hearst and Khosla as alleged herein. Thus, at the time
7    this suit was commenced, defendant Sindhu was not capable of disinterestedly and independently
8    considering a pre-suit demand to commence this litigation.

9         163.    Sindhu is directly interested in the stock option backdating scheme that is the subject
10    of this action. Defendant Sindhu received backdated stock options to purchase approximately 1.48
11    million shares of Juniper common stock.   In its 2006 Form 10-K, Juniper admits that "the
12    measurement dates of several grants to executive officers . . . and members of the Board of Directors
13    made between June 1999 and June 2003 were incorrect."

14         164.    Moreover, as a member of the Juniper Board, Sindhu also knowingly and deliberately
15    participated in and approved the improper backdating of stock options as the Company has admitted
16    that a number of the backdated grants were approved by the Board.

17         165.    Sindhu also knowingly and deliberately approved the filing of and signed false
18    financial statements as alleged herein at ¶¶104-138, as well as false and misleading proxy statements
19    as alleged herein at ¶¶61-87. Moreover, in connection with the 2000 Proxy Statement, Sindhu
20    knowingly and intentionally misrepresented Juniper's compensation practices while simultaneously
21    seeking shareholder approval to increase the authorized number of Company shares from 200
22    million to 1 billion, in order to provide the necessary shares for, *inter alia*, "grants under employee
23    benefit and employee stock incentive plans." In connection with the 2001 Proxy Statement, Sindhu
24    knowingly and intentionally misrepresented Juniper's compensation practices while simultaneously
25    asking shareholders to vote against a shareholder proposal that would have sought to limit the
26    Board's discretion to reprice stock options to a lower exercise price without approval of the
27    Company's shareholders. In connection with the 2005 Proxy Statement, Sindhu knowingly and

28

1  intentionally misrepresented Juniper's compensation practices while simultaneously seeking

2  shareholder approval for the 2006 Equity Incentive Plan.

3      166.    In addition, Sindhu's principal occupation since 1996 has been his employment with

4  Juniper through which he has received, and will continue to receive, millions of dollars in annual

5  salary, bonuses and other compensation.

6      167.    Finally, Sindhu is also incapable assessing a pre-suit demand independently of

7  defendants Hearst and Khosla due to their longstanding personal and professional relationships.

8  Sindhu founded Juniper in February 1996 with an investment from venture-capital firm, Kleiner,

9  Perkins, Caufield & Byers ("Kleiner Perkins"), where Hearst and Khosla served, and continue to

10  serve, as Affiliated Partners.

11  **Defendant Stensrud**

12      168.    Defendant Stensrud is interested in the transactions complained of herein because he

13  faces a substantial likelihood of being held liable for: (1) recommending the Board grant the

14  backdated options as a member of the Compensation Committee; and (2) approving the backdated

15  options as a member of the Board during the relevant period.  In addition, Stensrud knowingly and

16  deliberately participated in and approved the improper backdating of stock options, and knowingly

17  and deliberately participated in and approved the Company's filing of false financial statements and

18  other false SEC filings, as alleged herein, and therefore is substantially likely to be held liable for the

19  misconduct complained of herein.  Finally, Stensrud is incapable of independently assessing a

20  demand to institute this action against defendant Kriens due to their longstanding personal and

21  professional relationships.  Thus, at the time this suit was commenced, defendant Stensrud was not

22  capable of disinterestedly and independently considering a pre-suit demand to commence this

23  litigation.

24      169.    Stensrud, as a member of the Compensation Committee, was "responsible for setting

25  and administering the policies governing annual compensation of executive officers, consider[ing]

26  their performance and mak[ing] recommendations regarding their cash compensation and stock

27  options to the full Board of Directors."  Furthermore, Stensrud, as a member of the Compensation

28  Committee, was responsible for "establish[ing] and review[ing] general policies relating to the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  compensation and benefits of employees." Thus, Stensrud faces a substantial likelihood of being
2  held liable for recommending to the Board, and then approving, the backdated option grants as
3  alleged herein.

4      170.    Stensrud also knowingly and deliberately approved the filing of and signed false
5  financial statements as alleged herein at ¶¶104-138, as well as false and misleading proxy statements
6  as alleged herein at ¶¶61-87. Moreover, in connection with the 2000 Proxy Statement, Stensrud
7  knowingly and intentionally misrepresented Juniper's compensation practices while simultaneously
8  seeking shareholder approval to increase the authorized number of Company shares from 200
9  million to 1 billion, in order to provide the necessary shares for, *inter alia*, "grants under employee
10  benefit and employee stock incentive plans." In connection with the 2001 Proxy Statement,
11  Stensrud knowingly and intentionally misrepresented Juniper's compensation practices while
12  simultaneously asking shareholders to vote against a shareholder proposal that would have sought to
13  limit the Board's discretion to reprice stock options to a lower exercise price without approval of the
14  Company's shareholders. In connection with the 2005 Proxy Statement, Stensrud knowingly and
15  intentionally misrepresented Juniper's compensation practices while simultaneously seeking
16  shareholder approval for the 2006 Equity Incentive Plan.

17      171.    Finally, Stensrud is also incapable assessing a pre-suit demand independently of
18  defendant Kriens due to their longstanding personal and professional relationships. Kriens and
19  Stensrud together co-founded StrataCom in 1986 and worked there together until at least 1992,
20  eventually selling StrataCom to Cisco in 1996 for $4 billion.

21  **Defendant Hearst**

22      172.    Defendant Hearst is interested in the transactions complained of herein because he
23  faces a substantial likelihood of being held liable for: (1) approving the backdated options as a
24  member of the Board during the relevant period; and (2) knowingly and deliberately approving the
25  filing of false financial statements and other false SEC filings as a member of the Audit Committee
26  at all relevant times. Hearst, as a member of the Board, was responsible for approving the option
27  grants to executive officers including the backdated stock option grants to Kriens and Sindhu as
28  alleged herein. Hearst knowingly and deliberately participated in and approved and the improper

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  backdating of stock options, and knowingly and deliberately participated in and approved the
2  Company's filing of false financial statements and other false SEC filings, as alleged herein, and
3  therefore is substantially likely to be held liable for the misconduct complained of herein. Finally,
4  Hearst is incapable of independently assessing a demand to institute this action against defendants
5  Sindhu and Khosla due to their longstanding personal and professional relationships. Thus, at the
6  time this suit was commenced, defendant Hearst was not capable of disinterestedly and
7  independently considering a pre-suit demand to commence this litigation.

8       173.    Throughout the relevant period, the Board was responsible for approving the option
9  grants to executive officers, including Kriens and Sindhu. As a member of the Board, Hearst
10  approved all the backdated stock options to named executive officers. Thus, Hearst faces a
11  substantial likelihood of being held liable for approving the backdated option grants as alleged
12  herein.

13       174.    Hearst knowingly and deliberately approved the filing of and signed false financial
14  statements as alleged herein at ¶¶104-138, as well as false and misleading proxy statements as
15  alleged herein at ¶¶61-87. Moreover, in connection with the 2000 Proxy Statement, Hearst
16  knowingly and intentionally misrepresented Juniper's compensation practices while simultaneously
17  seeking shareholder approval to increase the authorized number of Company shares from 200
18  million to 1 billion, in order to provide the necessary shares for, *inter alia*, "grants under employee
19  benefit and employee stock incentive plans." In connection with the 2001 Proxy Statement, Hearst
20  knowingly and intentionally misrepresented Juniper's compensation practices while simultaneously
21  asking shareholders to vote against a shareholder proposal that would have sought to limit the
22  Board's discretion to reprice stock options to a lower exercise price without approval of the
23  Company's shareholders. In connection with the 2005 Proxy Statement, Hearst knowingly and
24  intentionally misrepresented Juniper's compensation practices while simultaneously seeking
25  shareholder approval for the 2006 Equity Incentive Plan.

26       175.    Finally, Hearst is also incapable assessing a pre-suit demand independently of
27  defendants Sindhu and Khosla due to their longstanding personal and professional relationships.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  Sindhu founded Juniper in February 1996 with an investment from Kleiner Perkins, where Hearst

2  and Khosla served, and continue to serve, as Affiliated Partners.

3  **Defendant Sclavos**

4      176.    Defendant Sclavos is interested in the transactions complained of herein because he

5  faces a substantial likelihood of being held liable for: (1) approving the backdated options as a

6  member of the Board during the relevant period; and (2) knowingly and deliberately approving the

7  filing of false financial statements and other false SEC filings as a member of the Audit Committee.

8  Sclavos, as a member of the Board, was responsible for approving the option grants to executive

9  officers including the backdated stock option grants to Kriens and Sindhu as alleged herein. Sclavos

10  knowingly and deliberately participated in and approved and the improper backdating of stock

11  options, and knowingly and deliberately participated in and approved the Company's filing of false

12  financial statements and other false SEC filings, as alleged herein, and therefore is substantially

13  likely to be held liable for the misconduct complained of herein. Finally, Sclavos is incapable of

14  independently assessing a demand to institute this action against defendant Kriens due to their

15  longstanding personal and professional relationships. Thus, at the time this suit was commenced,

16  defendant Sclavos was not capable of disinterestedly and independently considering a pre-suit

17  demand to commence this litigation.

18      177.    Throughout the relevant period, the Board was responsible for approving the option

19  grants to executive officers, thus, as a member of the Board, Sclavos approved all the backdated

20  stock options to named executive officers, including Kriens and Sindhu. Accordingly, Sclavos faces

21  a substantial likelihood of being held liable for approving the backdated option grants as alleged

22  herein.

23      178.    Sclavos knowingly and deliberately approved the filing of and signed false financial

24  statements as alleged herein at ¶¶109-138, as well as false and misleading proxy statements as

25  alleged herein at ¶¶65-87. Moreover, in connection with the 2000 Proxy Statement, Sclavos

26  knowingly and intentionally misrepresented Juniper's compensation practices while simultaneously

27  seeking shareholder approval to increase the authorized number of Company shares from 200

28  million to 1 billion, in order to provide the necessary shares for, *inter alia*, "grants under employee

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  benefit and employee stock incentive plans." In connection with the 2001 Proxy Statement, Sclavos

2  knowingly and intentionally misrepresented Juniper's compensation practices while simultaneously

3  asking shareholders to vote against a shareholder proposal that would have sought to limit the

4  Board's discretion to reprice stock options to a lower exercise price without approval of the

5  Company's shareholders. In connection with the 2005 Proxy Statement, Sclavos knowingly and

6  intentionally misrepresented Juniper's compensation practices while simultaneously seeking

7  shareholder approval for the 2006 Equity Incentive Plan.

8    179.   Finally, Sclavos is incapable assessing a pre-suit demand independently of defendant

9  Kriens due to their longstanding personal and professional relationships. Kriens and Sclavos have

10  served together on the board of directors of VeriSign since 2001, where Sclavos has served as

11  President and CEO since July 1995 and as Chairman since December 2001. VeriSign has also been

12  implicated in the option backdating scandal and faces several lawsuits relating to conduct

13  substantially similar to the backdating alleged herein.

14  **Defendant Levy**

15    180.   Defendant Levy is interested in the transactions complained of herein because he

16  faces a substantial likelihood of being held liable for: (1) recommending the Board grant the

17  backdated options as a member of the Compensation Committee; and (2) approving the backdated

18  options as a member of the Board during the relevant period. In addition, Levy knowingly and

19  deliberately participated in and approved the improper backdating of stock options, and knowingly

20  and deliberately participated in and approved the Company's filing of false financial statements and

21  other false SEC filings, as alleged herein, and therefore is substantially likely to be held liable for the

22  misconduct complained of herein.

23    181.   Levy, as a member of the Compensation Committee, was "responsible for setting and

24  administering the policies governing annual compensation of executive officers, consider[ing] their

25  performance and mak[ing] recommendations regarding their cash compensation and stock options to

26  the full Board of Directors." Furthermore, Levy as a member of the Compensation Committee was

27  responsible for "establish[ing] and review[ing] general policies relating to the compensation and

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  benefits of employees." Thus, Levy faces a substantial likelihood of being held liable for

2  recommending to the Board, and then approving, the backdated option grants as alleged herein.

3      182.    Levy knowingly and deliberately approved the filing of and signed false financial

4  statements as alleged herein at ¶¶124-138, as well as the false and misleading proxy statements as

5  alleged herein at ¶¶72-87. Moreover, in connection with the 2005 Proxy Statement, Levy knowingly

6  and intentionally misrepresented Juniper's compensation practices while simultaneously seeking

7  shareholder approval for the 2006 Equity Incentive Plan.

8      183.    Finally, Levy also served as Chairman of the Board of KLA-Tencor Corporation

9  ("KLA") since 1999, a position which he resigned from in October 2006 amidst the options

10  backdating scandal at KLA. Specifically, KLA has admitted that Levy, among other top executives,

11  received backdated options and now KLA expects to record total additional non-cash charges for

12  stock-based compensation expenses of approximately $400 million. Recently, KLA announced it is

13  the subject of a formal SEC probe.

14  **Defendant Goldman**

15      184.    Defendant Goldman is interested in the transactions complained of herein because he

16  faces a substantial likelihood of being held liable for: (1) approving the backdated options as a

17  member of the Board during the relevant period; and (2) knowingly and deliberately approving the

18  filing of false financial statements and other false SEC filings as a member of the Audit Committee

19  at all relevant times. Goldman, as a member of the Board, was responsible for approving the option

20  grants to executive officers including the backdated stock option grants to Kriens and Sindhu as

21  alleged herein. Goldman knowingly and deliberately participated in and approved the improper

22  backdating of stock options, and knowingly and deliberately participated in and approved the

23  Company's filing of false financial statements and other false SEC filings, as alleged herein, and

24  therefore is substantially likely to be held liable for the misconduct complained of herein. Thus, at

25  the time this suit was commenced, defendant Goldman was not capable of disinterestedly and

26  independently considering a pre-suit demand to commence this litigation.

27      185.    Throughout the relevant period, the Board was responsible for approving the option

28  grants to executive officers, including Kriens and Sindhu. As a member of the Board, Goldman

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   approved all the backdated stock options to named executive officers. Thus, Goldman faces a

2   substantial likelihood of being held liable for approving the backdated option grants as alleged

3   herein.

4       186.    Goldman knowingly and deliberately approved the filing of and signed false financial

5   statements as alleged herein at ¶¶124-138, as well as false and misleading proxy statements as

6   alleged herein at ¶¶72-87. Moreover, in connection with the 2005 Proxy Statement, Goldman

7   knowingly and intentionally misrepresented Juniper's compensation practices while simultaneously

8   seeking shareholder approval for the 2006 Equity Incentive Plan.

9   **Defendant Calderoni**

10      187.    Defendant Calderoni is interested in the transactions complained of herein because he

11  faces a substantial likelihood of being held liable for: (1) approving the backdated options as a

12  member of the Board during the relevant period; and (2) knowingly and deliberately approving the

13  filing of false financial statements and other false SEC filings as a member of the Audit Committee.

14  Calderoni knowingly and deliberately participated in and approved the improper backdating of stock

15  options, and knowingly and deliberately participated in and approved the Company's filing of false

16  financial statements and other false SEC filings, as alleged herein, and therefore is substantially

17  likely to be held liable for the misconduct complained of herein. Finally, Calderoni is incapable of

18  independently assessing a demand to institute this action against defendant Levy due to their

19  longstanding personal and professional relationship. Thus, at the time this suit was commenced,

20  defendant Calderoni was not capable of disinterestedly and independently considering a pre-suit

21  demand to commence this litigation.

22      188.    As a member of the Board, Calderoni approved backdated stock options and thus

23  faces a substantial likelihood of being held liable for approving the backdated option grants as

24  alleged herein.

25      189.    Calderoni knowingly and deliberately approved the filing of and signed false financial

26  statements as alleged herein at ¶¶124-138, as well as false and misleading proxy statements as

27  alleged herein at ¶¶72-87. Moreover, in connection with the 2005 Proxy Statement, Calderoni

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   knowingly and intentionally misrepresented Juniper's compensation practices while simultaneously

2   seeking shareholder approval for the 2006 Equity Incentive Plan.

3       190.    Finally, Calderoni is also incapable assessing a pre-suit demand independently of

4   defendant Levy due to their longstanding personal and professional relationships. Specifically, after

5   serving together on Juniper's Board since 2003, when Levy left KLA's board of directors amidst

6   KLA's options backdating scandal, Calderoni was recommended to fill one of the empty KLA board

7   seats and was recently elected to that position.

8       191.    As stated above, Goldman, Hearst and Calderoni are the current Audit Committee

9   members who performed the internal review of the Company's past option granting practices. The

10  Audit Committee admitted that there were there were numerous instances in which grant dates were

11  chosen with the benefit of hindsight as to the price of our stock, so as to give favorable exercise

12  prices and that management failed to exercise sufficient responsibility for the stock options granting

13  process. However, despite convincing evidence of misconduct against the Company, the members

14  of the Audit Committee have not commenced any actions against any of the defendants, thus

15  demonstrating that they are hostile to this action, and it would be unreasonable to expect them to

16  independently and disinterestedly respond to the claims alleged herein.

17      192.    In addition to the foregoing, plaintiff has not made any demand on the present Board

18  of Directors of Juniper to institute this action because such demand would be a futile and useless act

19  for the foregoing and following reasons:

20          (a)    The entire Board participated in the wrongs complained of herein, as they

21  created, approved, authored, signed and/or circulated the false and misleading statements, including

22  false proxy statements and annual reports on Form 10-K, for almost a decade.

23          (b)    Each of the directors named as defendants receive substantial director fees,

24  option grants, benefits and other emoluments by virtue of their membership on the Board and their

25  control of Juniper. They have thus benefited from the wrongs herein alleged and have engaged

26  therein to preserve their positions of control and the perquisites thereof, and are incapable of

27  exercising independent objective judgment in deciding whether to bring this action. The Board

28  members also have close personal and business ties with each other and are, consequently, interested

1  parties and cannot in good faith exercise independent business judgment to determine whether to

2  bring this action against themselves.

3         (c)     Each director has failed in his position of trust, as a director and as a member

4  of the various committees he sits upon.  For example, the Audit Committee (defendants Calderoni,

5  Goldman, Sclavos and Hearst) was responsible for ensuring that the Company complied with

6  accurate financial reporting, public disclosure and compliance activities.   Yet, despite such

7  responsibilities and defendants' backdating scheme, which was concealed from the public and the

8  SEC, no effort was made by the defendants on the Audit Committee to halt the misconduct.

9         (d)     The Compensation Committee consisted of defendants Levy, Marshall and

10  Stensrud, each of whom specifically approved the stock-based programs and compensation for

11  defendants.  The Nominating Committee (defendants Stensrud, Levy and Goldman) was responsible

12  for monitoring and evaluating corporate governance.  Defendants' stock option backdating scheme

13  deviates from any good faith attempt to comply with corporate governance.

14         (e)     Juniper's directors' and officers' liability insurance policies have an "insured

15  vs. insured" exclusion.  Thus, if the directors caused the Company to sue its officers and directors for

16  the liability asserted in this case it would not be insured for that liability.  This derivative suit does

17  not trigger the "insured vs. insured" exclusion, and thus, only this derivative suit can obtain a

18  recovery on the directors' and officers' liability insurance and benefit the Company.

19                                   **COUNT I**

20              **(Against All Defendants for Violation of §14(a) of the Exchange Act)**

21     193.    Plaintiff incorporates ¶¶1-192.

22     194.    Defendants, by use of the mails or by any means or instrumentality of interstate

23  commerce or of any facility of a national securities exchange or otherwise, knowingly, negligently or

24  with deliberate recklessness, solicited by means of a proxy statement, form of proxy, notice of

25  meeting or other communication, written or oral, containing statements which, at the time and in the

26  light of the circumstances under which they were made, were false and misleading with respect to

27  material facts, or omitted to state material facts necessary in order to make the statements therein not

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 60 -

1 | false or misleading or necessary to correct statements in earlier communications with respect to the

2 | solicitation of the proxy for the same meeting or subject matter which was false or misleading.

3 | 195.    By engaging in the conduct alleged above, defendants violated §14(a) of the

4 | Exchange Act, and Rule 14a-9 promulgated thereunder.

5 | 196.    Plaintiff, as a shareholder of Juniper, seeks damages and other relief for Juniper.

6 | **COUNT II**

7 | **(Against All Defendants for Violation of §10(b) of the Exchange Act)**

8 | 197.    Plaintiff incorporates ¶¶1-192.

9 | 198.    Throughout the relevant period, defendants individually and in concert, directly and

10 | indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails,

11 | engaged and participated in a continuous course of conduct designed to divert hundreds of millions

12 | of dollars to defendants via improper option grants.

13 | 199.    Defendants employed devices, schemes and artifices to defraud while in possession of

14 | material, adverse nonpublic information and engaged in acts, practices and a course of conduct that

15 | included the making of, or participation in the making of, untrue and/or misleading statements of

16 | material facts and/or omitting to state material facts necessary in order to make the statements made

17 | about Juniper not misleading.

18 | 200.    Defendants, as top executive officers and directors of the Company, are liable as

19 | direct participants in the wrongs complained of herein.    Through their positions of control and

20 | authority as officers of the Company, each of the defendants was able to and did control the conduct

21 | complained of herein and the content of the public statements disseminated by Juniper.

22 | 201.    Defendants acted with scienter throughout the relevant period, in that they either had

23 | actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or

24 | acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true

25 | facts, even though such facts were available to them.    Defendants were among the senior

26 | management of the Company, and were therefore directly responsible for the false and misleading

27 | statements and/or omissions disseminated to the public through press releases, news reports and

28 | filings with the SEC.

202.    Each of the defendants participated in a scheme to defraud with the purpose and effect of defrauding Juniper.

203.    By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

204.    Plaintiff, as a shareholder of Juniper, seeks damages and other relief for Juniper.

### COUNT III

**(Against All Defendants for Violation of §20(a) of the Exchange Act)**

205.    Plaintiff incorporates ¶¶1-192.

206.    Defendants, by virtue of their positions with Juniper and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Juniper within the meaning of §20(a) of the Exchange Act. They had the power and influence and exercised the same to cause it to engage in the illegal conduct and practices complained of herein.

207.    Plaintiff, as a shareholder of Juniper, seeks damages and other relief for Juniper.

### COUNT IV

**(Against All Defendants for Breach of Fiduciary Duties and Aiding and Abetting Breach of Fiduciary Duties)**

208.    Plaintiff incorporates ¶¶1-192.

209.    Defendants engaged in conduct in breach of their fiduciary duties of good faith, honesty and loyalty owed to Juniper.

210.    Defendants abused the control reposited in them by virtue of their high-level positions in the Company and were aided and abetted by each other.

211.    By reason of the foregoing conduct, defendants have damaged Juniper.

212.    Plaintiff, as a shareholder of Juniper, seeks damages and other relief for Juniper.

### COUNT V

**(Against All Defendants for Corporate Waste)**

213.    Plaintiff incorporates ¶¶1-192.

214.    As a result of defendants' misconduct and waste of corporate assets Juniper has sustained damage.

1    215.    Plaintiff, as a shareholder of Juniper, seeks damages and other relief for Juniper.

2    **COUNT VI**

3    **(Against All Defendants for Gross Mismanagement)**

4    216.    Plaintiff incorporates ¶¶1-192.

5    217.    Defendants have grossly mismanaged Juniper.  They have also failed to exercise

6    independent or good faith oversight of Juniper or its executives, and thus have permitted that gross

7    mismanagement.

8    218.    By their actions, defendants breached their duties to oversee, direct and control

9    Juniper in a manner consistent with the legal duties of directors and officers of a publicly held

10    company and under the applicable state laws.

11    219.    Plaintiff, as a shareholder of Juniper, seeks damages and other relief for Juniper.

12    **COUNT VII**

13    **(Against All Defendants for Unjust Enrichment)**

14    220.    Plaintiff incorporates ¶¶1-192.

15    221.    As a result of the unlawful conduct detailed above, defendants have been or will be

16    unjustly enriched at the expense of Juniper.  In particular, defendants will be unjustly enriched to the

17    extent they have and/or will continue to receive excessive compensation, stock options and/or insider

18    trading proceeds despite their breaches of fiduciary duty, gross mismanagement, abuse of control

19    and other misconduct detailed herein.

20    222.    Defendants should be required to disgorge the gain which they unjustly obtained at

21    the expense of Juniper.

22    223.    As a result of the defendants' misconduct and unjust enrichment, Juniper has

23    sustained damage.

24    224.    Plaintiff, as a shareholder of Juniper, seeks damages and other relief for Juniper.

25    **COUNT VIII**

26    **(Against All Defendants for Abuse of Control)**

27    225.    Plaintiff incorporates ¶¶1-192.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

226.    Defendants, together with their corporate allies, own and/or control Juniper and have the power to dictate the outcome of Juniper's business and affairs.  As persons with the power to direct Juniper's business and affairs, defendants owed Juniper a fiduciary duty to act in the best interests of the Company and not for their own personal profit or gain.

227.    Nevertheless, over the past decade, defendants have abused their control by engaging in a secret stock option backdating scheme, and grossly mismanaging Juniper's business so badly that Juniper's market capitalization has collapsed and its goodwill and reputation have been ruined. Defendants also deliberately and/or recklessly refused to exercise independent and good faith oversight of Juniper and its executives, and therefore deliberately allowed the abuse of control complained of herein to occur.

228.    This conduct by defendants amounted to an abuse of their abilities to act in the best interest of Juniper in violation of their fiduciary obligations as controlling persons, directors and/or officers of Juniper.

229.    As a result of defendants' misconduct, Juniper has sustained damage.

230.    Plaintiff, as a shareholder of Juniper, seeks damages and other relief for Juniper.

## COUNT IX

### (Against Defendants Calderoni, Gani, Hearst, Kriens, Marshall, Sindhu, Stensrud and Wexler for Insider Selling and Misappropriation of Information)

231.    Plaintiff incorporates ¶¶1-192.

232.    At the time of their stock sales, defendants Calderoni, Gani, Hearst, Kriens, Marshall, Sindhu, Stensrud and Wexler knew that the Company's financial results were false and misleading. These defendants' sales of Juniper common stock while in possession and control of this material adverse nonpublic information was a breach of their fiduciary duties of good faith, honesty and loyalty.

233.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the fiduciary owed by defendants Calderoni, Gani, Hearst, Kriens, Marshall, Sindhu, Stensrud and Wexler to Juniper, plaintiff, on behalf of the Company, is entitled to the imposition of a

1    trust on any profits defendants Calderoni, Gani, Hearst, Kriens, Marshall, Sindhu, Stensrud and

2    Wexler obtained thereby.

3        234.    Plaintiff, as a shareholder of Juniper, seeks damages and other relief for Juniper.

4    <div align="center">**COUNT X**</div>

5    <div align="center">**(Against Defendants Calderoni, Goldman, Gani, Hearst, Kriens, Krishnamurthi,**
6    **Marshall, Sindhu, Stensrud and Wexler for Violation of California**
**Corporations Code §§25402 and 25502.5)**</div>

7        235.    Plaintiff incorporates ¶¶1-192.

8        236.    When defendants received their backdated options and/or sold their Juniper common

9    stock, they knew highly material inside information regarding the Company, including the fact that

10    they were causing Juniper to grant millions of dollars worth of improperly backdated stock options

11    to themselves and others, which, if disclosed, would have a substantial adverse impact on Juniper

12    business and financial results.

13        237.    While in possession of material adverse information regarding their backdating of

14    stock options, and improper accounting for these stock options, defendants abused their fiduciary

15    positions by selling over 16 million shares of Juniper stock for over $717.2 million.

16        238.    Defendants Calderoni, Gani, Goldman, Hearst, Kriens, Krishnamurthi, Marshall,

17    Sindhu, Stensrud and Wexler made these sales when they knew that they were improperly granting,

18    and had been improperly granted, backdated stock options, that (contrary to public filings) these

19    stock options had been granted with exercise prices far below fair market value, and that Juniper was

20    not taking the compensation charges it was required to take.

21        239.    At the time of such sales, that information was not generally available to the public or

22    the securities markets. Had such information been generally available, it would have significantly

23    reduced the market price of Juniper shares at that time.

24        240.    Defendants Calderoni, Gani, Goldman, Hearst, Kriens, Krishnamurthi, Marshall,

25    Sindhu, Stensrud and Wexler had actual knowledge of material, adverse nonpublic information and

26    thus sold their Juniper common stock in California in violation of California Corporations Code

27    §25402.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

241.    Pursuant to California Corporations Code §25502.5, defendants Calderoni, Gani, Goldman, Hearst, Kriens, Krishnamurthi, Marshall, Sindhu, Stensrud and Wexler are liable to Juniper for damages in an amount up to three times the difference between the price at which Juniper common stock was sold by defendants, and the market value that Juniper common stock would have had at the time of the sale if the information known to defendants had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

242.    During the period of time during which defendants issued themselves backdated options with the intention of exercising those options and selling their shares on the open market, Juniper had total assets in excess of $1,000,000 and a class of equity security held of record by 500 or more persons.

243.    At all relevant times, Juniper had total assets in excess of $1,000,000 and a class of equity security held of record by 500 or more persons as set forth below:

| Date | No. Shareholders of Record |
|---|---|
| 03/09/01 | 833 |
| 03/15/02 | 1,519 |
| 02/28/03 | 1,623 |
| 01/31/04 | 1,520 |
| 01/31/05 | 1,7000 |
| 01/31/06 | 1,650 |

244.    Plaintiff, as a shareholder of Juniper, seeks damages and other relief for Juniper.

### COUNT XI

### (Against All Defendants for Rescission)

245.    Plaintiff incorporates ¶¶1-192.

246.    As a result of the acts alleged herein, the stock option contracts defendants and Juniper entered into during the relevant period were obtained through defendants' breaches of fiduciary duty, gross mismanagement and abuse of control. Further, the backdated stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of Juniper's stock option plans which were also approved by its shareholders and filed with the SEC.

247.    All contracts which provide for stock option grants between defendants and Juniper that were entered into during the relevant period should, therefore, be rescinded, with all sums paid

1    under such contracts returned to the Company, and all such executory contracts cancelled and

2    declared void.

3        248.    Plaintiff, as a shareholder of Juniper, seeks damages and other relief for Juniper.

4    <div align="center">COUNT XII</div>

5    <div align="center">**(Against All Defendants for an Accounting)**</div>

6        249.    Plaintiff incorporates ¶¶1-192.

7        250.    At all relevant times, defendants, as directors and/or officers of Juniper, owed the

8    Company fiduciary duties, including good faith, honesty and loyalty.

9        251.    In breach of their fiduciary duties owed to Juniper, defendants caused Juniper, among

10   other things, to grant backdated stock options to themselves and/or certain other officers and

11   directors of Juniper.  By this wrongdoing, defendants breached their fiduciary duties owed to

12   Juniper.

13       252.    Defendants possess complete and unfettered control over their improperly issued

14   stock option grants and the books and records of the Company concerning the details of such

15   improperly backdated stock option grants to Juniper executives and employees.

16       253.    As a result of defendants' misconduct, Juniper has been substantially injured and

17   damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those

18   improperly granted options which have been exercised and sold.

19       254.    Plaintiff demands an accounting be made of all stock options grants made to

20   defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value

21   of the grants, the recipients of the grants, the exercise date of stock options granted to defendants, as

22   well as the disposition of any proceeds received by defendants via sale or other exercise of

23   backdated stock option grants received by the defendants.

24       255.    Plaintiff, as a shareholder of Juniper, seeks damages and other relief for Juniper.

25   <div align="center">**PRAYER FOR RELIEF**</div>

26       WHEREFORE, plaintiff demands judgment as follows:

27

28

1    A.    Awarding money damages against all defendants, jointly and severally, for all losses
2  and damages suffered as a result of the acts and transactions complained of herein, together with pre-
3  judgment interest, to ensure defendants do not participate therein or benefit thereby;

4    B.    Directing all defendants to account for all damages caused by them and all profits and
5  special benefits and unjust enrichment they have obtained as a result of their unlawful conduct,
6  including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and
7  imposing a constructive trust thereon;

8    C.    Directing Juniper to take all necessary actions to reform and improve its corporate
9  governance and internal control procedures to comply with applicable law, including, but not limited
10  to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or
11  Articles of Incorporation and taking such other action as may be necessary to place before
12  shareholders for a vote adoption of the following Corporate Governance policies:

13        (a)    a proposal requiring that the office of CEO of Juniper and Chairman of the
14  Juniper Board of Directors be permanently held by separate individuals and that the Chairman of the
15  Juniper Board meet rigorous "independent" standards;

16        (b)    a proposal to strengthen the Juniper Board's supervision of operations and
17  develop and implement procedures for greater shareholder input into the policies and guidelines of
18  the Board;

19        (c)    appropriately test and then strengthen the internal audit and control functions;

20        (d)    rotate independent auditing firms every five years;

21        (e)    control and limit insider stock selling and the terms and timing of stock option
22  grants; and

23        (f)    reform executive compensation;

24    D.    Ordering the imposition of a constructive trust over defendants' stock options and any
25  proceeds derived therefrom;

26    E.    Awarding punitive damages;

27    F.    Awarding costs and disbursements in this action, including reasonable attorneys',
28  accountants' and experts' fees; and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 68 -

1        G.    Granting such other and further relief as this Court may deem just and proper.

2    <center>**JURY DEMAND**</center>

3        Plaintiff demands a trial by jury.

4    DATED: August 21, 2007                 LERACH COUGHLIN STOIA GELLER
5                                         RUDMAN & ROBBINS LLP
                                 SHAWN A. WILLIAMS

6

7

8                                     SHAWN A. WILLIAMS

9                                   100 Pine Street, Suite 2600
                               San Francisco, CA 94111
                               Telephone: 415/288-4545
10                                   415/288-4534 (fax)

11                                   LERACH COUGHLIN STOIA GELLER
                                     RUDMAN & ROBBINS LLP
12                                   DARREN J. ROBBINS
                               TRAVIS E. DOWNS III
13                                   655 West Broadway, Suite 1900
                               San Diego, CA 92101
14                                   Telephone: 619/231-1058
                               619/231-7423 (fax)
15

16                                   THE WEISER LAW FIRM, P.C.
                               ROBERT B. WEISER
17                                   121 N. Wayne Avenue, Suite 100
                               Wayne, PA 19087
18                                   Telephone: 610/225-2677
                               610/225-2678 (fax)
19                                   Attorneys for Plaintiff

20    S:\CasesSD\Juniper Networks Derivative\CPT Juniper Networks 4.doc

21

22

23

24

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                               - 69 -

1

**CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

2      Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the

3    named parties, there is no such interest to report.

4

5

6    _____

ATTORNEY OF RECORD FOR PLAINTIFF

7    ARLEE C. GOWEN

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JUNIPER NETWORKS INC. VERIFICATION

I, Arlee C. Gowen , hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief.

DATE: _July 18, 2007_

_____
SIGNATURE